UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PATRICK CHARLES HANNON,

     Petitioner,

-vs-                                    Case No.  8:06-cv-2200-T-24TBM

SECRETARY, DEPARTMENT OF
CORRECTIONS,

     Respondent.

_____

O R D E R

This cause is before the Court on Petitioner Patrick Hannon's amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 13) (hereinafter "petition"). Hannon is a Florida prisoner under sentence of death.

Hannon filed a memorandum in support of the petition. (Doc. No. 10) (hereinafter "memo"). Respondent filed a response to the petition (Doc. No. 19), and Hannon filed a reply to the response. (Doc. No. 24).  The petition was timely-filed and venue in this Court is proper because Hannon was tried and sentenced in Hillsborough County, Florida, within this Division of the Middle District of Florida.

Upon due consideration of each of Hannon's claims, the Court has determined that none have merit and that the petition should be **DENIED**.

BACKGROUND

On March 27, 1991, Patrick Hannon and Ronald Richardson were charged by superseding indictment with the premeditated murders of Brandon Snider (Count One) and Robert Carter (Count Two). (App. A14/1683-1685). Due to their differing speedy trial expiration

dates and Richardson's request for a continuance, their cases were ultimately severed for trial. Hannon's jury trial began July 15, 1991 and concluded July 24, 1991. (App. A13/1634; A14/1657-1658; 1783-1784; 1792).

On direct appeal, the Florida Supreme Court set out the pertinent facts:

> Brandon Snider, a resident of Tampa, went to Indiana to visit relatives. While there, he went to the home of Toni Acker, a former girlfriend, and vandalized her bedroom. On January 9, 1991, Snider returned to Tampa. On January 10, 1991, Hannon, Ron Richardson, and Jim Acker went to the apartment where Snider and Robert Carter lived. Snider opened the door and was immediately attacked by Acker, who is Toni Acker's brother. Acker stabbed Snider multiple times.[1] When Acker was finished, Hannon cut Snider's throat. During the attack, Snider's screams drew the attention of his neighbors. They also drew the attention of Carter, who was upstairs. Hearing the screams, Carter came downstairs and saw what was happening. He then went back upstairs and hid under his bed. Hannon and Acker followed Carter upstairs. Then Hannon shot Carter six times, killing him.

> In July 1991, Hannon was brought to trial for the murders of Snider and Carter. During the trial, Richardson reached an agreement with the State. He pled guilty to being an accessory after the fact and testified against Hannon. Hannon was found guilty of both murders. After a penalty proceeding,[2] the jury unanimously recommended death. The trial court found the following aggravating circumstances applicable to both murders: (1) previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel. Sec. 921.141(5)(a), (d), and (h), Fla. Stat. (1991). As to Carter, the court found

---

[1] Acker was tried in a separate proceeding, was convicted, and was sentenced to two life sentences. *Hannon v. State*, 638 So. 2d 39, 41 n.1 (Fla. 1994).

[2] During the penalty phase, the State relied on the evidence presented during the guilt phase and did not call additional witnesses. (App. 13/1594). The defense presented additional testimony during the penalty phase. First, the defense recalled Toni Acker, who emphasized that Hannon "would not do anything like that." (App. 13/1594).

Defense counsel also called Hannon's parents, Barbara and Charles Hannon. (App. A13/1597-1600). Barbara Hannon testified that her son had never hurt anyone in his whole life and she implored the jury not to take away his freedom "for something he didn't do" and to "give us a chance to prove he never did anything like this." (App. A13/1599; 2324). Charles Hannon testified and stressed that his son had always been a "teddy bear" and that he had never been violent. Charles Hannon adamantly believed that his son was innocent and that he [Patrick Hannon] ought to have a chance to prove his innocence. (App. A13/1600).

2

the additional aggravating factor that the murder was committed to avoid or prevent a lawful arrest. Sec. 921.141(5)(e), Fla. Stat. (1991). In mitigation, the court considered testimony from Hannon's mother and father that Hannon was not a violent person. Also, the court considered the fact that Hannon's original co-defendant, Richardson, was no longer facing the death penalty. The trial court found that the aggravating factors outweighed the mitigating factors and followed the jury's recommendation, imposing separate death sentences on Hannon for the murders of Snider and Carter.

*Hannon v. State*, 638 So. 2d 39, 41 (Fla. 1994) (footnotes omitted).

On direct appeal, the Florida Supreme Court affirmed Hannon's convictions and death sentences. *See Hannon v. State*, 638 So. 2d 39 (Fla. 1994), decided June 2, 1994, as revised on denial of rehearing, September 8, 1994.  Hannon then filed a petition for writ of certiorari in United States Supreme Court.  Review was denied on February 21, 1995. *Hannon v. Florida*, 513 U.S. 1158 (1995). (App. B1-B3).

Next, Hannon filed an interlocutory appeal related to DNA testing. *See FSC Case No. SC01-2774.*  (App. C2). On April 17, 2002, the Florida Supreme Court dismissed this appeal. *Hannon v. State*, 817 So. 2d 847 (Fla. 2002)(citing *Trepal v. State*, 754 So. 2d 702 (Fla. 2000)).

On March 17, 1997, Hannon filed a motion for postconviction relief in the trial court, raising 34 grounds for relief. Hannon filed an amended motion on April 10, 2000, raising 21 grounds for relief. (App. D3/385-526).

The state trial court held a *Huff* hearing on November 16, 2001. *See Huff v. State*, 622 So. 2d 982 (Fla. 1993).  On that same day, the state trial court issued an order reflecting its determination that an evidentiary hearing was required to address claims IV (in part), V (in part), IX, X (in part), XVI (in part), XIX (in part), and XXI of Hannon's motion for postconviction relief. The evidentiary hearing was conducted by the state trial court on February 18, 2002, and June 21, 2002.

The state trial court entered two comprehensive written orders addressing the postconviction claims. The first order, which summarily denied postconviction relief, in part, was 102 pages in length, and included excerpts from the trial record. (App. D6/1073-1174). Following the evidentiary hearing, on February 3, 2003, the state trial court issued its final written order denying postconviction relief. (App. D10/1998-2043).

Hannon appealed the denial of postconviction relief in FSC Case Number SC03-893. The Florida Supreme Court affirmed the state trial court's denial of postconviction relief in *Hannon v. State,* 941 So. 2d 1109 (Fla. 2006), decided August 31, 2006, rehearing denied by *Hannon v. State*, 2006 Fla. LEXIS 2627 (Fla., Oct. 27, 2006).

## STANDARD OF REVIEW

Because Hannon filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections,* 290 F.3d 1318 (11th Cir. 2002). The standard Hannon must meet could not be higher; it is not enough that the state court "got it wrong." Hannon must show that the result of the state court's decision was objectively unreasonable. *Bell v. Cone,* 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, *supra*).

In the event constitutional error is found in a habeas proceeding, the relevant harmless

4

error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The test is "less onerous" then the harmless error standard enunciated in *Chapman v. California*, 386 U.S. 18 (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637. Although no constitutional error has occurred in Hannon's case, any possible error would be harmless beyond any reasonable doubt based on the facts and the record herein.

No evidentiary hearing is required because none of Hannon's claims turn on any unresolved issue of fact;  all involve issues of law argued on the basis of the existing record.[3]

DISCUSSION

Ground One

**Mr. Hannon was denied the effective assistance of counsel due to trial counsel's failure to investigate and present mitigation and due to his failure to obtain adequate mental health assistance at the penalty phase of his capital trial in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution**.

Hannon contends that trial counsel was ineffective in allegedly failing to investigate and present additional mitigation, including mental health experts, at the penalty phase. See, Amended Petition at 5 (Doc. 13: Memo at 12-30 (Doc. 10).

Hannon's ineffective assistance of counsel (IAC) penalty phase claims were the subject of an evidentiary hearing in the state trial court and were rejected on both the prejudice and

---

[3] The state trial court conducted an evidentiary hearing.  Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

5

deficiency prongs under *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

Because the state court adjudicated Hannon's IAC/penalty phase claims on the merits, this Court may grant relief only if the state court's adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

In order for Hannon to obtain federal habeas corpus relief, he must demonstrate that his case satisfies the requirements set forth in either §2254(d)(1) or §2254(d)(2). In addition, it is the petitioner's burden under §2254(e) to overcome the state court's fact finding by "clear and convincing evidence." For the following reasons, Hannon has not demonstrated any basis for federal habeas relief under AEDPA.

*Strickland v. Washington*, 466 U.S. 668 (1984), establishes the test that governs claims of ineffective assistance of counsel, *i.e.*, the "clearly established Federal law" relevant to this case under 28 U.S.C. § 2254(d). *See, Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006). In rejecting Hannon's IAC/penalty phase claims, the Florida Supreme Court evaluated Hannon's claims under *Strickland*, and stated, in its comprehensive analysis:

II. Ineffective Assistance of Counsel at the Penalty Phase

> To succeed in an ineffective assistance of penalty phase counsel claim, the claimant must demonstrate that counsel performed deficiently and that such deficiency prejudiced his defense. *See Strickland*, 466 U.S. at 687. Pursuant to *Strickland*, trial counsel has an obligation to conduct a reasonable investigation into mitigation. *See id.* at 691; see also *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003). Counsel's decision to not present mitigation evidence may be a tactical decision properly within counsel's discretion. *See Brown v. State*, 439 So. 2d 872, 875 (Fla. 1983) ("The choice by counsel to present or not present evidence in mitigation is a tactical decision properly within

6

counsel's discretion."); *Valle v. State*, 705 So. 2d 1331, 1335 n.4 (Fla. 1997) (same); *Gorham v. State*, 521 So. 2d 1067, 1070 (Fla. 1988) (same). When evaluating claims that counsel was ineffective for failing to investigate or present mitigating evidence, this Court has phrased the defendant's burden as showing that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding." *Asay v. State*, 769 So. 2d 974, 985 (Fla. 2000) (quoting *Rutherford v. State*, 727 So. 2d 216, 223 (Fla. 1998)). Further, as the United States Supreme Court recently stated in *Wiggins*:

>  [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. .
>
>  . . . . . . [O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their [sic] performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."

539 U.S. at 521-23 (citations omitted) (fifth alteration in original) (first emphasis supplied) (quoting *Strickland*, 466 U.S. at 688-89, 691).

 Contrary to the critical dissenting view, the counsel provided was neither standardless nor empty. As evidence of trial counsel's deficiency, Hannon asserts that trial counsel advanced an invalid lingering doubt argument during the penalty phase, hopeful that the jury would believe Hannon did not have the type of character to be involved in these crimes, and that trial counsel failed to investigate and present mitigation during the penalty phase. Specifically, Hannon asserts that trial counsel was ineffective in pursuing the innocence/alibi defense even after Hannon's alibi, Richardson, had changed his testimony to assist the State at the end of the trial and the jury had found Hannon guilty.

 The nature of our bifurcated system in Florida places an onerous burden on death penalty counsel to be informed when making strategic and tactical decisions throughout both the guilt and penalty phases. Such is neither standardless nor an empty promise. We require and encourage death penalty counsel to conduct reasonable investigations as are appropriate to ensure that he or she can properly counsel and inform a defendant with regard to the nature

and extent of the mitigation that may be viable in the case. However, not every death penalty investigation will find mitigating evidence, and an investigation into mitigation will run the gamut from discovering latent superficial mental disabilities to very open and evident brain damage. In addition, *Strickland* does not require defense counsel to present mitigating evidence at sentencing in every case. *See Wiggins*, 539 U.S. at 533. However, if defense counsel decides not to investigate mitigation, that "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 691); *see also Rose v. State*, 675 So. 2d 567, 572 (Fla. 1996) (stating that in evaluating the competence of counsel "the actual performance of counsel in preparation for and during the penalty phase proceedings, as well as the reasons advanced therefor," must be considered).

Investigating and presenting mental health mitigation is not always but certainly at times may be inconsistent with presenting an innocence defense during the penalty phase. However, failing to investigate and present mental health mitigation is not the *sine qua non* of ineffective assistance of counsel. We therefore must determine whether trial counsel's particular decision in this case not to investigate and develop mitigation was reasonable under the circumstances. *See Wiggins*, 539 U.S. at 521-22. Based on the record in this case, Hannon has not and cannot demonstrate that his trial counsel was deficient during the penalty phase because, under these circumstances, Hannon's trial counsel at the time had specific tactical and calculated reasons for the strategy adopted. Counsel did not default in his obligation, as characterized by the dissent, but strategically adopted a different path. Further, the path taken was one with which Hannon agreed and which he fully supported. [n8]

> n8 The dissent asserts that when trial counsel initially stated that he would not be offering evidence in mitigation, the trial court "directed [counsel] to reconsider" his decision, see dissenting op. at 95-96; however, the trial court merely gave Hannon's trial counsel overnight to review pertinent case law and "thoroughly discuss whether or not the defendant should put on mitigating evidence." With regard to the initial decision not to present mitigation, trial counsel stated, "We have discussed it, but I was expressing [Hannon's] wishes. I will continue to discuss it." (Emphasis supplied.) Even the trial judge expressly noted that "[i]f Mr. Hannon knowingly and intelligently waives his right to present mitigating evidence or circumstances, he has that right under the law."

In *Koon v. Dugger*, 619 So. 2d 246, 250 (Fla. 1993), this Court acknowledged the "problems inherent in a trial record that does not adequately reflect a defendant's waiver of his right to present any mitigating evidence" and announced the following prospective rule to be applied in such situations:

> When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.

*Id.* at 250. Hannon's trial preceded this Court's decision in *Koon*. Therefore, counsel could not benefit from the aforementioned rule in memorializing on the record that Hannon had knowingly and voluntarily waived the presentation of any type of mitigation that would detract from Hannon's assertion that he was not at the crime scene and he did not possess the type of character to commit the murders.

At the postconviction evidentiary hearing, trial counsel testified that Hannon, as well as Hannon's parents, adamantly maintained Hannon's innocence throughout the guilt and penalty phases. Trial counsel therefore decided to focus on obtaining an acquittal during the guilt phase, arguing that Hannon was totally innocent and not present at the crime scene, and then only if necessary proceed to establish during the penalty phase that Hannon did not have the type of character to commit such murders. Trial counsel testified that Hannon assisted in every aspect of his defense, [n9] including testifying in his own defense during the guilt phase, and agreed to continue with the presentation of the innocence theme defense during the penalty phase, even after he was convicted. Trial counsel stated that he explained mitigation to Hannon and advised Hannon that he could change his position and admit his involvement in the murders during the penalty phase, but Hannon said he did not wish to do so. *Cf. Cummings-El v. State*, 863 So. 2d 246, 252 (Fla. 2003) (concluding that counsel was not ineffective in limiting mitigation investigation where defendant was adamant about not wanting his family to "beg for his life," and the defendant understood the nature and consequences of his decision not to present mitigating evidence). [n10]

> n9 Trial counsel testified that Hannon understood the jury process and his rights in the criminal proceedings, that he paid attention to the progress of his case, and that he exhibited no signs of mental impairment.

> n10 Hannon's decision not to present evidence in mitigation is demonstrated by Mrs. Hannon stating as she testified at the penalty phase that Hannon "didn't want us to [testify] because he knows

9

how badly we're hurting."

Trial counsel further testified that he had discussions with Hannon's parents and his sister Moreen, and he sought their input with regard to Hannon's defense. According to counsel, Hannon's parents and Moreen also agreed with a penalty phase strategy of character and to continue maintaining Hannon's innocence. Trial counsel stated that Hannon's parents "continued to believe their son did not and could not do this." Therefore, the dissent's assertion that counsel "blindly follow[ed] his client's desire to limit mitigation," see dissenting op. at 102, is unsupported by the postconviction record. Rather, counsel's adoption of a strategy that focused on Hannon's character was the product of discussions with not only Hannon, but with his most intimate family members. According to counsel, Hannon and his family agreed not to pursue a strategy where, after proceeding during the guilt phase on the theory that Hannon was not present at the time of the murders, Hannon at the penalty phase would suddenly admit he committed the crimes and begin offering evidence in mitigation of the murders. Counsel stated that he, Hannon, and his family "decided that [changing tactics] wasn't what it was going to be because Mr. Hannon was adamant. I can't tell you how much he was adamant he wasn't there." Neither Hannon nor any of his family members suggested any mitigation matters for the penalty phase. Rather, Hannon, his parents, and his sister consistently urged the strategy that counsel ultimately adopted and pursued; that is, "keep[ing] a consistent defense and a consistent position."

Trial counsel further testified that he was fully aware that lingering doubt was not a statutory mitigator. However, trial counsel stated that providing evidence during the penalty phase that Hannon did not have the type of character to commit the murders, and continuing to support the underlying innocence defense, had a real and practical jury effect that would mitigate in favor of the jury sparing Hannon's life. [n11] It was the character and demeanor of Hannon that trial counsel advanced in a very practical way. Even an expert in capital cases presented by Hannon during the postconviction evidentiary hearing admitted that the consistent approach had a practical and real impact factor in the juror's vote in terms of whether to vote for life imprisonment, notwithstanding that lingering doubt is not a recognized and valid statutory mitigating factor.

> n11 Contrary to the dissent's assertion, we have not "transformed counsel's continuing innocence strategy into a lingering doubt strategy" or a "reasonable doubt" strategy. Dissenting op. at 93-94. We reiterate that counsel's strategy was to demonstrate to the jury that Hannon in no way possessed the type of character to commit the crimes. Counsel also testified at the postconviction hearing that it was his strategy to persuade the jurors to recommend life over death by virtue of the fact that Hannon, who had already been found guilty of two murders, was not "begging for his life" but

instead addressed and emphasized demeanor and character to continue to insist that he did not and could not commit the crimes.

The record supports trial counsel's postconviction testimony that a defense based on the notions that Hannon did not commit the murders and was not even the type of person who could have committed the murders was developed from the beginning of trial. Even during the guilt phase, trial counsel presented Rusty Horn and Paul Kilgore to show that Hannon did not have the type of character to commit the murders and moved all of their guilt phase testimony into evidence during the penalty phase. Horn, Hannon's roommate and supervisor at his stucco job, described Hannon as a "teddy bear" type who had a reputation for nonviolence. Kilgore, another of Hannon's roommates, testified that Hannon was a nice person. Trial counsel decided it was not necessary, and likely would not have made any difference, to recall Horn and Kilgore during the penalty phase to reiterate that to which they had already testified. The record also demonstrates that trial counsel presented mitigation during the guilt phase through Hannon, who testified that he attended high school through the eleventh grade; wanted to work, earn money, and learn a trade; was a hard worker; obtained a job with Rusty Horn where he received an extra fifty cents an hour if he did not drink; worked at a gas station; delivered auto parts and pizza; and visited his sister's house on Christmas and celebrated with his nieces and nephews.

Trial counsel presented further evidence that Hannon did not have the type of character to commit these murders through the penalty phase testimony of Toni Acker and Hannon's mother and father. Acker testified that Hannon was "a good-time guy, carefree, liked to have fun"; that Hannon had cared for her child; and that Hannon was incapable of conduct such as these murders. Hannon's mother testified that Hannon had never hurt anyone in his entire life and that Hannon could not hurt any animal or person. Hannon's mother also pleaded with the jury, "Please, you've taken away his freedom for something he didn't do. Don't take away his life. Give us a chance, please, to prove that he never did anything like this. He couldn't." Hannon's father testified that Hannon had never been a violent person, and that he was always a "teddy bear." Hannon's father also testified that "[Hannon] says he's innocent. I believe he's innocent, and I think he ought to be given a chance to prove that he is innocent. That's it." The record supports trial counsel's postconviction evidentiary hearing testimony that his penalty phase strategy was to establish that Hannon did not have the type of character to commit the murders.

Contrary to the dissent's misdirected charge, we have not failed to recognize our legal precedent with regard to "lingering doubt" and have expressly factored that consideration into our decision today. This Court has repeatedly observed that residual doubt is not legally appropriate as a mitigating circumstance, *see, e.g., Darling v. State,* 808 So. 2d 145, 162 (Fla. 2002), and has consistently concluded that it is not error to deny an instruction that would

allow a jury to consider lingering doubt or exclude evidence of lingering doubt during the penalty phase. *See Duest v. State*, 855 So. 2d 33, 40 (Fla. 2003) (concluding that the trial court did not err in denying an instruction that the jury could consider lingering doubt in rendering its advisory sentence).

Although this Court has previously rejected an argument that trial counsel was ineffective in the penalty phase for failing to argue lingering doubt as a mitigating circumstance, *see Trepal v. State*, 846 So. 2d 405, 434 (Fla. 2003), it has never expressly determined that trial counsel is per se ineffective for pursuing the practical impact that character evidence may create jury doubt and the impact it may have during the penalty phase. *But see Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 787 (11th Cir. 2003) ("Parker's attorneys were not deficient in focusing their time and energy on acquittal at trial and focusing their arguments at sentencing on residual doubt instead of other forms of mitigation." (parentheses omitted)). Further, contrary to the dissent's claim that we are ignoring United States Supreme Court case law, see dissenting op. at 92, that Court has never resolved the issue advanced by the dissent either, not even in its most recent decision touching upon lingering doubt. *See Oregon v. Guzek*, 126 S. Ct. 1226, 163 L. Ed. 2d 1112 (2006). [n12] However, trial counsel's strategy in the instant case of presenting evidence to demonstrate that Hannon did not have the type of character to commit the murders was a tactical method used by trial counsel in an attempt to sway the jury's recommendation in favor of life over death. *See Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (concluding that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character that the defendant proffers as a basis for a sentence less than death). [n13] It is certainly logical that a jury of laypersons is less likely to recommend death if they have some lingering concerns about guilt than if there is absolute certainty on the issue of guilt. *See Lockhart v. McCree*, 476 U.S. 162, 181, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) ("[J]urors who decide both guilt and penalty are likely to form residual doubts or 'whimsical' doubts . . . about the evidence so as to bend them to decide against the death penalty. Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases.") (quoting *Grigsby v. Mabry*, 758 F.2d 226, 247-48 (8th Cir. 1985) (Gibson, J., dissenting)); *Parker*, 331 F.3d at 787-88 ("Creating lingering or residual doubt over a defendant's guilt is not only a reasonable strategy, but is perhaps the most effective strategy to employ at sentencing.") (internal quotation marks omitted). The dissent refuses to even consider that lawless conduct related to illegal drugs or alcohol at times may even itself operate to be aggravating in the eyes of a lay jury rather than mitigating, as the dissent portrays those factors present. *See generally Cummings-El*, 863 So. 2d at 267 ("Counsel acknowledged that drug abuse can have a double-edged sword effect on the jury, as juries are not sympathetic to junkies generally.") (quoted from trial court's denial order attached to opinion).

n12 In none of the cases cited by the dissent does the United States Supreme Court address the effectiveness of counsel for arguing that the commission of a murder was completely out of line with a defendant's character. Hence, contrary to the dissent's claim that we are ignoring Supreme Court case law on lingering doubt, see dissenting op. at 92, we instead conclude that such case law is not dispositive as to the issue that we decide today.

Moreover, to the extent the dissent asserts that in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), the United States Supreme Court, and in *Rose v. State*, 675 So. 2d 567 (Fla. 1996), this Court "explicitly disapproved" of a continuing assertion of innocence defense, see dissenting op. at 92, this statement is misdirected. In neither *Wiggins* nor *Rose* did the Court hold that counsel was ineffective for pursuing an innocence strategy, nor prohibit a defense based on the character of the defendant. Rather, in both cases the Courts found that counsel was ineffective for failing to adequately investigate into mitigation that could have been discovered had counsel conducted a reasonable investigation. The instant case is distinguishable from *Wiggins* and *Rose* in that Hannon's counsel made a reasoned decision to limit his investigation into mitigation based on Hannon's express desire that he pursue a strategy that Hannon did not possess the type of character to commit the murders. Further, the instant case is distinguishable from *Rose* in that, while counsel in Rose pursued a penalty phase strategy that he believed to be ill-conceived, counsel in the instant case agreed with his client that maintaining a consistent position during the penalty phase was a viable strategy.

n13 *See also King v. Dugger*, 555 So. 2d 355, 360 (Fla. 1990) (Barkett, J., dissenting) ("I believe that a jury is entitled to, and often does, mitigate a sentence because of 'lingering doubt' about the defendant's guilt."); *Melendez v. State*, 498 So. 2d 1258, 1263 (Fla. 1986) (Barkett, J., specially concurring) ("There is certainly nothing irrational--indeed, there is nothing novel--about the idea of mitigating a death sentence because of lingering doubts as to guilt.") (quoting *Heiney v. Florida*, 469 U.S. 920, 921, 105 S. Ct. 303, 83 L. Ed. 2d 237 (1985) (Marshall, J., dissenting from denial of certiorari)); *see also Way v. State*, 760 So. 2d 903, 924 (Fla. 2000) (Pariente, J., concurring) ("I urge the Legislature [to] consider including evidence of residual doubt as a statutory mitigating factor that could be considered by juries in making a sentence recommendation, the trial court in imposing the death sentence, and this Court in determining whether the death penalty should be affirmed."). Although the dissent criticizes the reference to these views, they are presented not for authority, but for the common sense and grounded logic they set forth.

13

The conduct of Hannon's trial counsel does not constitute per se ineffective assistance of counsel. In *Haliburton v. Singletary*, 691 So. 2d 466 (Fla. 1997), this Court determined that conduct similar to that of Hannon's counsel did not constitute ineffective assistance. *See id.* at 471. At the evidentiary hearing in Haliburton, trial counsel testified that, although he was aware that Haliburton had suffered physical and sexual abuse as a child and that he had a history of substance abuse, and that these factors would be considered mitigating in many cases, they were more harmful than helpful in the case. *See id.* This information would have been more mitigating than any factor in the present case. Trial counsel in Haliburton testified that he elected not to call the mental health expert, even though she could have testified that there was a strong indication of brain damage, because she would have also testified that Haliburton was an extremely dangerous person and that he was likely to kill again. *See id.* According to trial counsel, testimony that Haliburton's emotional problems and deprived upbringing caused him to commit the crime or lessened his culpability would have conflicted with the picture of charity and pacifism painted by the other defense witnesses and would have been inconsistent with Haliburton's strategy. *See id.* The testimony that the defense witnesses offered in Haliburton is similar to the character evidence presented by trial counsel in the instant case. Trial counsel's penalty phase strategy was to humanize Haliburton by dwelling upon his close family ties and on the positive influence he had on his family and fellow inmates. *See id.* This Court held that "[e]ven though this strategy was unsuccessful in persuading the court and jury to sentence Haliburton to life imprisonment, we cannot conclude that he was ineffective. In light of the substantial, compelling aggravation found by the trial court, there is no reasonable probability that had the mental health expert testified, the outcome would have been different." *Id.*; *see also Henry v. State*, 862 So. 2d 679, 686 (Fla. 2003) (determining there was no deficient performance in counsel's decision to humanize defendant rather than use mental health testimony); *Shere v. State*, 742 So. 2d 215, 223-24 (Fla. 1999)(determining that counsel was not ineffective for failing to request a neuro-psychological or neurological exam by a qualified expert even though trial counsel had obtained evidence of defendant's "severe head injury as a youth and his subsequent headaches" where counsel's penalty phase strategy was to portray the defendant as "a kind, gentle, God-fearing man"); *Rutherford v. State*, 727 So. 2d 216, 223 (Fla. 1998) (determining there was no error where retrial counsel was aware of mental mitigation "but made a strategic decision under the circumstances . . . to instead focus on the 'humanization' of Rutherford through lay testimony"); *Bryan v. Dugger*, 641 So. 2d 61, 64 (Fla. 1994) (determining that trial counsel was not ineffective for choosing a mitigation strategy of humanizing the defendant and not calling a mental health expert).

Similar to trial counsel's evidentiary hearing testimony in Haliburton, trial counsel in this case testified that his primary goal was to convince the jury that Hannon was not at the crime scene and that he was not the type of person to commit these murders, and that counsel intentionally sought to avoid

contradicting that defense by presenting witnesses to testify that Hannon had used illegal drugs, was unstable, failed at school, or was abused. [n14] Trial counsel's strategy in this case from the beginning of trial and through the penalty phase was to emphasize Hannon's good character traits. According to trial counsel, attempting to present testimony that Hannon may have had drug and alcohol problems that may have influenced him to commit the murders, or hiring a mental health expert attempting to discuss possible mental health mitigation to lessen his culpability would have been in total conflict with the picture of the nonviolent, "teddy bear" image of Hannon and would have been inconsistent with his innocence/alibi defense. Even though ultimately this strategy was unsuccessful in convincing the court and the jury to sentence Hannon to life imprisonment, we conclude, as in Haliburton, that trial counsel was not ineffective in this case. The dynamics of a jury and a jury trial may often place practical considerations of human nature and citizen interaction on a level that cannot be simply ignored notwithstanding guiding statutory considerations when issues of life or death are involved.

> n14 The dissent proclaims that counsel was "unfamiliar with the prevailing death penalty case law on mitigation, such as *Ake v. Oklahoma*," see dissenting op. at 109; however, this statement is hugely conclusory and not supported by the postconviction evidentiary transcript. The dissent takes counsel's statement that he was not familiar with the *Ake* case "off the top of my head," and untenably uses this one statement to reach the sweeping conclusion that counsel lacked knowledge about case law concerning mitigation in death penalty cases. Indeed, it is a conclusory statement in itself to presume that any particular case is "prevailing" in a particular legal area. Further, the *Ake* case is not even relevant to the instant proceedings because counsel's strategy during the penalty phase--a strategy that Hannon himself approved--was to present evidence that Hannon did not possess the character to commit the murders and that he was innocent of the crimes--not that he suffered from some sort of brain injury or mental illness at the time of the murders.

An analogy can also be drawn to *Straight v. Wainwright*, 422 So. 2d 827 (Fla. 1982), a case in which the defendant challenged his trial counsel's failure to investigate for the purpose of developing evidence of mitigating circumstances. *See id.* at 832. There, trial counsel, as did trial counsel in this case, stated that he did not present mitigating circumstances because he felt them to be, even after the verdict of guilt, fundamentally inconsistent with the entire defense. *See id.* This Court concluded that trial counsel's performance was not ineffective where trial counsel viewed evidence of mitigating circumstances as fundamentally damaging to the integrity of his client's case. *See id.* Similar to trial counsel in *Straight*, Hannon's counsel here believed that any evidence of mitigating

circumstances available would only damage the integrity of Hannon's case. Further, Hannon agreed with counsel in this case that mitigation evidence should not be presented during the penalty phase. Under the totality of the circumstances at the time of trial, counsel was not deficient in strategically choosing not to present mitigation evidence that would be in conflict with and contradict Hannon's innocence/alibi defense. *See Parker*, 331 F.3d at 788 (counsel not ineffective for failing to introduce evidence of mental defects and personality disorder where counsel did not see any signs of brain damage or mental disorder, and counsel further thought such evidence would be inconsistent with the defendant's alibi defense and would undermine defendant's credibility); *Cummings-El,* 863 So. 2d at 252 (determining that counsel's performance was not deficient where penalty phase strategy was to present defendant in a positive light and not to present evidence of defendant's drug use, poor upbringing, and family members' criminal backgrounds; counsel believed that such evidence would have an adverse effect on the jury and, further, introducing any evidence of mental illness would have been inconsistent with the aforementioned strategy); *Brown v. State*, 439 So. 2d 872, 875 (Fla. 1983) (concluding that under the totality of the circumstances at the time of trial, counsel was reasonably effective where he testified that in his opinion presentation of mitigation evidence during the penalty phase was contradictory to the alibi defense and the defendant did not assist in pursuing mitigating evidence).

Neither the United States Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003), nor its recent decision in *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005), compels a different conclusion. In *Wiggins*, the Court concluded that defense counsel's performance fell below an objective standard of reasonableness where counsel abandoned their investigation into mitigation even though their limited investigation revealed information that would have led a "reasonably competent attorney to investigate further." 539 U.S. at 527. The Supreme Court noted that defense counsel's investigation included a review of reports which noted that Wiggins had spent most of his life in foster care and had displayed emotional difficulties while there and that Wiggins' mother was a chronic alcoholic who on at least one occasion left her children alone for days without food. *See id.* at 523, 525. The Supreme Court concluded that a reasonable attorney would have realized the need to pursue these leads further, but defense counsel abandoned the investigation at this juncture. *See id.* at 527. [n15] The Supreme Court determined that counsel's failure to investigate further into Wiggins' background resulted from inattention rather than reasoned strategic judgment, in part because during opening statements, counsel informed the jurors, "You're going to hear that [Wiggins] has had a difficult life," but then failed to provide the jury with any details of Wiggins' life history. *See id.* at 526. In holding that counsel's performance was deficient, the Supreme Court nonetheless noted that "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at

sentencing," *id.* at 533, and distinguished Wiggins' case from others where the High Court had concluded that limited investigations into mitigation were reasonable. *See id.* at 535.

> n15 The Supreme Court noted in part that further inquiry likely would have revealed repeated incidents of sexual abuse suffered by Wiggins that could have been offered in mitigation. *See id.* at 525.

In the recently decided *Rompilla*, the Supreme Court concluded that the defense counsel's conduct in preparation for the sentencing phase fell below the level of reasonable performance that is required by *Wiggins* and *Strickland* where defense counsel failed to review a court file on the defendant's prior conviction. *See* 125 S. Ct. at 2463-64. The Court stressed that it was not creating a per se rule requiring defense counsel to "do a complete review of the file on any prior conviction." *Id.* at 2467. Rather, the High Court found that counsel's performance fell below a level of reasonable performance because counsel knew that the Commonwealth intended to seek the death penalty by proving *Rompilla* had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. *Id.* at 2464.

The Supreme Court in its conclusion emphasized that "the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried," yet "counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time," the day before the evidentiary sentencing phase began. *Id.* Although the facts of *Rompilla* led the Court to the conclusion that defense counsel's performance was unreasonable, the Court held that "[o]ther situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment." *Id.* at 2467.

A careful reading of the Supreme Court's decisions in *Wiggins* and *Rompilla* reveals that those decisions are inapplicable to the facts of the instant matter. Unlike *Wiggins*, in the instant case there were no reports containing evidence of Hannon's life history which should have prompted trial counsel to conduct a deeper investigation into Hannon's background. In fact, trial counsel testified that during the criminal proceedings neither Hannon, his father, his mother, nor his sister Moreen ever mentioned that Hannon might suffer from some form of brain injury, that Hannon was abused or neglected, or that he had a traumatic childhood or a substantial drug problem. According to counsel, when asked if Hannon had been born with any problems, Hannon's parents stated that they had "no problem with him." Moreover, unlike *Rompilla,* there is no indication

here that the State planned to rely on particular material in aggravation that was not obtained and reviewed by trial counsel prior to the penalty phase trial. Finally, and most distinguishing, unlike the defendants in *Wiggins* and *Rompilla*, Hannon adamantly expressed his wish to proceed consistent with the innocence defense during the penalty phase. The dissent's assertion that we have "ignore[d] the mandate for defense counsel's duty to investigate," dissenting op. at 92, does not accommodate these critical facts. Consistent with his client's wishes, trial counsel sought to demonstrate that Hannon did not have the type of character to commit the murders rather than offering evidence on Hannon's drug use, his mental fitness, or his family history. Therefore, unlike defense counsel's deficient performances in *Wiggins* and *Rompilla*, trial counsel's limited investigation into mitigation under the specific facts of the instant case, which was based on the express wishes of Hannon, was within the level of reasonable performance that is required by *Strickland* and *Wiggins*.

Hannon has also failed to demonstrate that he suffered prejudice. Contrary to the dissent's view that a per se rule of reversal is required, upon application of all applicable authorities, including *Wiggins* and *Rompilla*, relief is not available here. In assessing prejudice, we reweigh the evidence in aggravation against the totality of the mental health mitigation presented during the postconviction evidentiary hearing to determine if our confidence in the outcome of the penalty phase trial is undermined. *See Rutherford v. State*, 727 So. 2d 216, 223 (Fla. 1998) (stating that in assessing prejudice "it is important to focus on the nature of the mental mitigation" now presented); *see also Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."). We conclude that it does not. There is no reasonable probability that had any of the mental health experts who testified at the postconviction evidentiary hearing testified at the penalty phase, Hannon would have received a life sentence. Our confidence has not been undermined in this outcome or proceeding.

At the evidentiary hearing, Hannon presented the testimony of Drs. Barry Crown, Faye Sulton, and Jonathan Lipman. Dr. Crown, an expert in clinical and forensic psychology and neuropsychology as well as substance abuse, testified that he performed a neuropsychological evaluation of Hannon and had reviewed background materials, as well as a cognitive test that had already been performed by Dr. Sulton. Dr. Crown testified that Hannon scored within normal limits on most of the tests that were administered and opined that Hannon's overall cognitive processing was "squarely within the heartland of what we would consider to be a typical person," but he demonstrated some difficulty with rapidly retrieving stored information and applying it to a new situation. Dr. Crown also testified that Hannon may have had some brain damage but he could not state that the brain damage in any way affected Hannon's behavior on the date of the crime because Dr. Crown had not been asked to consider or determine that in his evaluation.

18

Dr. Sulton, an expert in clinical psychology, testified that Hannon's thinking was not disturbed, nor was he having hallucinations or so deeply depressed that his thinking would be distorted. She opined that Hannon did not have any obvious major mental illness and that his behavior did not make much sense in light of his normal intelligence. She also testified that by January of 1991, Hannon had experienced many failures personally and professionally, worked several jobs, had been unsuccessful in the military, used vast amounts of illegal substances over a long period of time, and that his ability to function on a day-to-day basis, reason, use good judgment, and logically and sequentially plan activities were all compromised. She also testified that she found only nonstatutory mitigation through her interviews with family members and Hannon. These included areas of general parental neglect, lack of structure, and lack of discipline and guidance in his early environment; a childhood history of illness that interfered with his school life at a crucial time; extreme dependence on other people to assist him in basic living skills; dependence on Ron Richardson for employment and drugs; substance abuse over many years; extraordinary impulsivity at times and great lack of concentration; and an inability to formulate goal-directed behavior and to live as an adult. Dr. Sulton further testified that Hannon's personality changes, impulsivity, irritability, difficulty with concentration, and paranoid thinking would have impacted his day-to-day life. Ultimately, Dr. Sulton testified that in her opinion Hannon was not incompetent to stand trial at any point, was not insane at the time of the incident, and was of average intelligence. n16 Dr. Sulton agreed with Dr. Crown's overall picture of Hannon's normalcy with only some areas of deficit.

> n16 Dr. Sulton testified that Hannon had a verbal IQ of 112, which is bright to average, a performance IQ of 102, which is average, and full scale IQ of 108, which is average.

Dr. Lipman, a neuropharmacologist, testified that Hannon's degree of intoxication at the time of the offenses would not suggest to him that Hannon was unable to remember what occurred or would have rendered him unable to know what he was doing at the time of the crime. Dr. Lipman, however, admitted that he probably underestimated Hannon's drug burden at the time of the offense because he was not aware that Hannon had used cocaine the night of the crimes. Dr. Lipman basically agreed with the State's expert's conclusions, which included a polysubstance abuse diagnosis.

The State's expert, Dr. Merin, an expert in the fields of neuropsychology and forensic psychology, testified that he reviewed Drs. Sulton and Crown's testing and administered the Wechsler Adult Intelligence Scale III test to Hannon. Dr. Merin testified that he agreed with Dr. Crown's conclusions with the exception of Dr. Crown's finding of prefrontal lobe impairment. Dr. Merin explained the discrepancy was based on Dr. Crown using a shorter version of the Category Test. Dr. Merin testified that when he did the longer version of the test, three

years after Dr. Crown, there was no indication of any prefrontal lobe impairment. Dr. Merin testified that he did not find any significant brain injury. Dr. Merin also opined that because Hannon was heavily into drugs and alcohol, he probably had destroyed some neurons in his brain, but not to the extent that it interfered with his ability to reason, to make decisions on his own behalf, to maintain goal-directed behavior, or to think logically. Dr. Merin further testified that he found no indication of any thought disorder or suggestion of psychosis or brain-related problems.

The postconviction testimony presented failed to establish the existence of statutory mental health mitigation (and indeed underscored Hannon's average intelligence and ability to reason), no expert was able to identify any significant brain damage, and there was contrary evidence. Even Dr. Crown, who arguably provided the most favorable testimony for Hannon, could not translate any brain damage as having any conceptual or actual impact on Hannon's behavior, and there was no evidence to establish any nexus between Hannon's mental health and his behavior or as it related to the crimes. Therefore, portraying Hannon as a drugged-out individual who had been involved in prior bad acts would have been more harmful, especially considering that the mental health implications were so equivocal.

Moreover, contrary to the dissent's claim that an investigation by trial counsel would have revealed "voluminous evidence of mitigation," see dissenting op. at 119, the mitigation provided by witnesses during the postconviction evidentiary hearing was not compelling. n17 Indeed, the dissent offers what is actually a very one-sided presentation of postconviction witness testimony which creates a distorted view of Hannon's home life in an effort to bolster its assertion that trial counsel was ineffective for failing to conduct further investigation into mitigation. [n18] Further, in sentencing Hannon to death, the trial judge found substantial aggravation in this case. Specifically, the trial court found three aggravating circumstances applicable to both the murders of Snider and Carter-- (1) previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel. *See Hannon*, 638 So. 2d at 41. As to Carter, the trial court found the additional aggravating factor that the murder was committed to avoid or prevent a lawful arrest. *See id.* [n19] On direct appeal, we affirmed the court's findings of aggravation. *See Hannon*, 638 So. 2d at 43.

> n17 At the evidentiary hearing, information regarding Hannon's drug and alcohol abuse as well as his upbringing and family situation was presented through the testimony of Hannon's family. Hannon's mother, father, and two sisters (Hellen Coker and Moreen Hannon) testified that their home life was difficult, especially when Stephanie, another of Hannon's sisters, had scoliosis, at which time the parents were barely home. Hannon's mother and father both

testified with regard to the problems they had with Moreen, who began abusing drugs and alcohol at age thirteen and had a close relationship with Hannon. Moreen also testified with regard to her running away from home as well as her alcohol and drug use. Hannon's mother testified that Hannon was a very good kid, had many friends, had developed rheumatic fever when he was seven or eight and was out of school for a few months, and was a pretty good student.

Moreen seemed to have more specific information with regard to Hannon's substance abuse than the rest of his family. Moreen testified that she was aware of Hannon's drug and alcohol use while growing up, that Hannon's drug use escalated over the years, that Hannon drank on a regular basis in 1990, and that she, Hannon, Ron Richardson, and Mike Richardson all drank alcohol as well as used cocaine. Moreen also testified that Hannon was a good worker and did not have any trouble getting a job although he moved around from job to job, and she described Hannon's behavior as agitated and irritated in 1990 during the time leading up to the murders. Hellen also testified that Hannon drank frequently when he was a teenager, and that Hannon was drinking and doing drugs excessively in 1990. Hannon's mother and father testified that they were unaware of the existence and extent of the substance abuse problem that emerged during Hannon's youth.

n18 For example, the dissent references Hellen Coker's testimony wherein she alleges physical abuse and emotional indifference by her parents. However, contrary to Hellen's testimony, Hannon's mother testified that she told her children that she loved them and hugged them, bought them birthday and Christmas presents, and that she never "smashed their face[s] into the wall." Hannon's father testified that he never spanked his children or struck them with a belt. While Mrs. Hannon admitted that she drank "a lot of wine," she also believed that it did not affect her ability to take care of the house and her children because "the kids looked terrific. The house was great." Despite the fact that Hannon developed rheumatic fever as a child, Hannon's mother testified that he did not have to make up the time he missed from school because his illness occurred partly during the summer, and further, "[Hannon] was a pretty good student, so he was okay." The dissent further takes out of context Hellen's statement that she left home five days after she turned eighteen because she "hated it." A review of her full testimony reveals that her home situation was not the only factor that led to her departure: "I hated it. I didn't like my home life. I didn't like the town we lived in. I mean you couldn't sneeze without somebody calling. They knew everything that went on. I just wanted to get away from there. Something different." Finally, Dr. Merin testified

that when he asked Hannon about his relationship with his father, Hannon stated, "I got along great with him. My only regret was that he was away so much." As to his mother, Hannon stated that they "[g]ot along great" and that he, as the Hannons' only son, received lenient treatment. In noting such testimony, we do not seek to present a lopsided view of Hannon's childhood in an effort to demonstrate that any existing mitigation was minimal. Rather, we only do so to demonstrate that the evidence in mitigation presented during the postconviction proceedings was equivocal and not "abundant," as the dissent proclaims. See dissenting op. at 116. The dissent characterizes our discussion of these elements of Hannon's background as mere "lip service," see dissenting op. at 103; however, the dissent lacks any basis for this assertion other than its subjective disagreement with our conclusion regarding the insignificance of the mitigation evidence presented at the postconviction hearing.

n19 Hannon asserts he was denied effective assistance of counsel because his trial counsel failed to adequately challenge the aggravators. However, once Hannon was convicted of the murders based on the facts in evidence, regardless of what trial counsel would have argued, the prior violent felony aggravator (contemporaneous killings) and the committed during a burglary aggravator were applicable as a matter of law. Although trial counsel in the instant case arguably could have more effectively challenged the HAC and the avoiding or preventing a lawful arrest aggravators during the penalty phase, the nature of the murders and facts in evidence in this case support the application of these aggravators, which were both challenged and upheld on direct appeal. See id. at 43-44. Thus, assuming without deciding whether trial counsel was deficient in challenging the aggravators, this claim is meritless because Hannon has failed to demonstrate prejudice.

With regard to the HAC aggravator, we have previously noted that it is one of the most serious aggravators set out in the statutory sentencing scheme, *see Everett v. State*, 893 So. 2d 1278, 1288 (Fla. 2004), *cert. denied*, 544 U.S. 987, 125 S. Ct. 1865, 161 L. Ed. 2d 747 (2005), and a review of the trial record demonstrates that the murders of Snider and Carter were particularly cruel. Hannon grabbed Snider, who had been stabbed by Acker fourteen times, from behind and slit his throat with such force that it nearly severed his head. Prior to that, Snider's screams could be heard throughout the apartment complex. An individual who was outside the apartment heard Snider gurgling on his own blood. At one point during the attack, Snider called to his roommate, "Call 911--my guts are hanging out." Upon hearing Snider's screams, Carter came downstairs and witnessed Snider's brutal stabbing. Carter pleaded with the attackers to spare his

life, at one point saying to Acker, "[L]et me get out of here," and then retreated to a bedroom upstairs, hiding under a bed. Despite these pleas, Hannon went upstairs and proceeded to fire six shots into the huddled, defenseless Carter with a semiautomatic pistol. Hannon fired two shots into Carter at close range, and four shots with the pistol placed in contact with, or nearly up against, Carter's body. Despite the number of gunshot wounds, Carter did not die instantaneously. An officer who responded to the 911 call testified that when he arrived at the upstairs bedroom, Carter was still gasping for breath--Carter stopped breathing only just before the paramedics reached the bedroom. Based on the brutal and disturbing nature of these murders, there is no reasonable possibility that Hannon would have received a life sentence. Therefore, Hannon has failed to demonstrate that if the mental health and lay witness testimony presented during the postconviction evidentiary testimony had been offered at trial "the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, and we fundamentally disagree with the dissent's assertion to the contrary. See dissenting op. at 116. Our confidence in the outcome of this case has not been undermined. *See id.* Accordingly, this claim is without merit.

*Hannon*, 941 So. 2d at 1124 -1138.

Hannon's IAC/penalty phase claim provides no basis for relief under AEDPA. Hannon has not demonstrated that the state court's rejection of this issue was either contrary to, or an unreasonable application of, federal law. The Florida courts expressly applied *Strickland* as the appropriate prevailing law, so they did not act contrary to established federal law. In addition, the rejection of this claim in state court was not an unreasonable application of *Strickland*. The Florida Supreme Court's finding, that trial counsel made reasonable strategic decisions, is supported on the record and refutes Hannon's allegation that trial counsel performed ineffectively.  In addition, Hannon has not established that he was prejudiced by trial counsel's performance.

A state court's decision is "contrary to" Supreme Court precedent only if (1) "the state court applies a rule that contradicts the governing law set forth" in Supreme Court cases; or (2) the state court confronts "a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different" from Supreme Court

precedent. *See Williams v. Taylor*, 529 U.S. 362 (2000).

A state court's decision is an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *See Lockyer v. Andrade*, 538 U.S. 63 (2003)(citation omitted). The state court's application of clearly established law "must be more than incorrect or erroneous," it must be "objectively unreasonable." *Id.*

The Florida Supreme Court correctly identified the principles announced in *Strickland* as those governing the analysis of Hannon's claim. Consequently, Hannon cannot show that the Florida Supreme Court's adjudication was contrary to the United States Supreme Court's clearly established law. *Williams,* 529 U.S. at 405. Nor can Hannon establish any "unreasonable application" of Supreme Court precedent. In evaluating a claim of ineffective assistance of counsel, reviewing courts must conduct a highly deferential review of counsel's performance and "'indulge [the] strong presumption' that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689-90. When courts examine the performance of an experienced trial counsel, "the presumption that his conduct was reasonable is even stronger." *Chandler  v. United States*, 218  F.3d 1305, 1316 (11th Cir. 2000) (en banc). Hannon's burden of persuasion is a heavy one: "petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315. Thus, even if trial counsel in this case relied on a "pure" "residual doubt" strategy, it would not have supported a claim of ineffective assistance of counsel. *See Alderman v. Terry*, 468 F.3d 775, 783 (11th Cir. 2006) (rejecting petitioner's habeas claim under AEDPA where defense attorneys pursued a lingering

24

or residual doubt theory and, in doing so, gave the jury a basis for returning a verdict of life imprisonment).

Furthermore, as for the second prong of *Strickland*, "[a] petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Stewart v. Secretary*, 476 F.3d 1193, 1209 (11th Cir. 2007)( quoting *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1322 (11th Cir. 2002)). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (citing *Strickland*, 466 U.S. at 693). Instead, when a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*(citing *Strickland* at 695).

In *Rutherford v. Crosby*, 385 F.3d 1300, 1306 (11th Cir. 2004), the Eleventh Circuit emphasized that, under AEDPA, the habeas petitioner "must do more than satisfy the *Strickland* standard. He must also show that in rejecting his ineffective assistance of counsel claim the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Chandler*, at 1309 (citing *Bell v. Cone*, 535 U.S. 685, 699 (2002)). Here, too, Hannon "must do more than satisfy the *Strickland* standard." He must also show that in rejecting his ineffective assistance of counsel claim the state court "'applied *Strickland* to the facts of his case in an objectively unreasonable manner.'" *Id.* at 1309. Hannon has not, and cannot, do so in this case.

The Florida courts meticulously evaluated each of Hannon's IAC/penalty phase claims under *Strickland*, and the Florida Supreme Court's dispositive factual findings are fully supported by the record. Hannon was represented by an experienced criminal trial attorney who pursued a consistent theme at trial – emphasizing Hannon's admirable character throughout

25

this case -- and, thereby, introducing mitigation on Hannon's behalf during both the guilt phase and penalty phase. Evidence presented during the guilt phase undeniably may be considered in mitigation. *See Bell v. Cone*, 535 U.S. 685, 700 (2002).

Hannon himself did not provide trial counsel with the information now urged as mitigating. Furthermore, trial counsel spoke to many of the same family members who testified at the post-conviction evidentiary hearing.   Trial counsel Joe Episcopo confirmed, at the evidentiary hearing, that it was a strategic decision not to present anything in the penalty phase that would detract from their consistent theory - that Hannon was not guilty and that, because of his character, he was not capable of committing the atrocities in this case: nearly beheading Brandon Snider and then chasing Robbie Carter and shooting him repeatedly at point-blank range.

As the Florida Supreme Court found, trial counsel's investigation and presentation of mitigating evidence was within the realm of constitutionally adequate assistance of counsel. Trial counsel conducted a reasonable investigation, presented appropriate guilt and penalty phase evidence, and emphatically urged the jury to recommend sparing Hannon's life.

The Supreme Court has never held that counsel must present all available mitigating evidence in the penalty phase of a capital trial in order to perform reasonably. In *Wiggins*, the attorney had not investigated sufficiently to make a reasonable decision about what evidence to present. In *Williams*, the Virginia state court had applied an incorrect standard in assessing the petitioner's ineffectiveness claim; the Court did not hold that counsel is constitutionally deficient for deciding against the presentation of mitigation on tactical grounds. *See also, Rutherford v. Crosby,* 385 F.3d 1300, 1315 (11th Cir. 2004) (rejecting ineffectiveness based on failure to present mitigating evidence, and distinguishing *Wiggins*, noting that the new mitigation

26

in *Wiggins* was not counterproductive or inconsistent with the other mitigation offered while Rutherford's mitigation "would have come with a price"). In *Rompilla*, the Supreme Court stressed that it was not creating a per se rule requiring defense counsel to "do a complete review of the file on any prior conviction." None of these cases interpret the Sixth Amendment as foreclosing counsel's ability to make reasonable strategic decisions limiting the presentation of mitigating evidence. To the contrary, case law has consistently recognized that an attorney has an obligation to make an appropriate decision about what evidence to present or not present. *See Housel v. Head*, 238 F.3d 1289, 1296 (11th Cir. 2001) (noting reasonableness of counsel's decision against focusing on intoxication and substance abuse in mitigation).

Hannon has not shown that his trial counsel was ineffective in his performance at the penalty phase of Hannon's trial. On the facts of this case, as carefully outlined by the Florida Supreme Court, Hannon has failed to demonstrate that the state courts acted unreasonably in rejecting Hannons' claim that counsel's performance was deficient at the penalty phase.

Moreover, even where a petitioner arguably demonstrates that his counsel's performance at sentencing was deficient, he must also show that he was prejudiced by his counsel's deficient performance. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland,* 466 U.S. at 693. Rather, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695;  *see Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006). In this double homicide case, there are three powerful aggravators as to each victim, and a fourth aggravator applicable to victim Robbie Carter. Hannon has not and cannot meet the standard required to prove that his attorney was ineffective when the facts that support these substantial aggravating

27

factors are compared to the fairly unremarkable mitigation now argued by habeas counsel.

Hannon has not shown that if trial counsel had introduced, at the penalty phase, all of the mental health evidence advocated at the postconviction evidentiary hearing, the outcome of the penalty phase would have been different.  In short, Hannon has not shown that he was prejudiced by trial counsel's representation at the penalty phase.

Because Hannon has not satisfied either of the *Strickland* prongs, Hannon is not entitled to relief on Ground One.

### Ground Two

**Mr. Hannon was denied the effective assistance of counsel pre-trial and at the guilt phase of his trial due to trial counsel's failure to present a voluntary intoxication defense and his failure to adequately investigate and prepare for trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution**

Hannon asserts that trial counsel was ineffective during the guilt phase for failing to present a voluntary intoxication defense and for failing adequately to investigate and prepare for trial. Amended Petition at 6 (Doc. 13); Supporting Facts at 6-8 (Doc. 13-2); Memo at 31-44 (Doc. 10).

### The Voluntary Intoxication Defense Claim

Hannon faults trial counsel for failing to pursue a voluntary intoxication defense. This claim has no merit. Hannon's defense was alibi and an innocence theory. Hannon's trial counsel cannot be deemed ineffective for failing to pursue the voluntary intoxication defense because such a defense would have been inconsistent with Hannon's innocence theory. Hannon testified

during the trial proceedings that he did not commit the crime. Had trial counsel presented a voluntary intoxication defense, it would have been totally inconsistent with Hannon's defense that he did not commit the murder. Trial counsel's strategy in this case amounted to a tactical decision well within his discretion;  the strategy was so obvious from the record that no evidentiary hearing on this issue was necessary in state court. *See Hannon*, 941 So. 2d  at 1139.

<u>The Failure of Trial Counsel To Adequately Investigate and Prepare for Trial</u>

A. Blood Spatter Expert Judith Bunker

Hannon argues that trial counsel was ineffective for failing to investigate and then, at trial, to cross-examine blood spatter expert Judith Bunker as to her false credentials. As a result, Hannon claims, the jury never heard "the truth regarding her credentials, and thus, they were deprived of material evidence critical to evaluating the reliability and trustworthiness of Mrs. Bunker's testimony."  This claim also has no merit.

Trial counsel testified at the postconviction evidentiary hearing that (1) he chose not to question Bunker's credentials at trial to avoid giving the jury the impression that he was attempting to present an inconsistent defense; and (2) Bunker's testimony did not adversely impact Hannon's defense because Bunker was never able to confirm that any of the victims' blood was on Hannon.

In affirming the denial of this post-conviction claim, the Florida Supreme Court stated:

> At the evidentiary hearing, trial counsel testified that he was aware that Bunker had been hired as the State's expert but decided not to conduct an investigation into Bunker's credentials because her testimony regarding the blood spatter at the crime scene was totally irrelevant to Hannon's alibi defense that he was not at the crime scene on the night of the murders, a factor not considered by the dissent. Trial counsel stated that he did not obtain Bunker's personnel file, was not aware whether Bunker ever completed high school or attended college,

and had not seen a group of letters indicating that Bunker had not worked at various places or lectured at certain places as represented on her resume. Trial counsel stated at the postconviction evidentiary hearing that he most likely would not have used this information regarding Bunker to impeach her at trial. Although confronting this witness with this type of information would have made him look sharp, it would not have advanced Hannon's defense in any way and would have only left the jury wondering why counsel was even taking the time to question Bunker if she truly had nothing to do with Hannon's defense. The dissent provides no explanation for this gap. Trial counsel further testified that he chose not to question Bunker's credentials at trial to avoid giving the jury the impression that he was attempting to present an inconsistent defense. Trial counsel testified that Bunker's testimony did not adversely impact Hannon's defense because Bunker was never able to confirm any of the victims' blood on Hannon. He did object to the introduction of crime scene photographs because he believed the photographs were being admitted simply to emphasize the goriness of the crime but decided not to cross-examine Bunker with regard to these photographs. The defense strategy was to continue with the theory that Hannon was not at the crime scene and, therefore, cross-examining this witness would only confuse the jury with regard to why he was attacking a witness that was not at all relevant to Hannon's case. . . .

Moreover, trial counsel's tactical decision not to challenge or impeach Bunker's blood spatter testimony was reasonable because Bunker's testimony did not implicate Hannon in the murders, nor was it even an element in the State's case against Hannon.

*Hannon, 941 So. 2d at 1123-1124.*

This Court agrees that trial counsel's failure to cross-examine Bunker as to her false credentials was a reasonable trial strategy because "Bunker's testimony did not implicate Hannon in the murders, nor was it even an element in the State's case against Hannon." The defense strategy was to continue the theory that Hannon was not at the crime scene, and cross-examining Bunker would have confused the jury with regard to why trial counsel was attacking a witness who was not relevant to Hannon's case.

Hannon has also failed to demonstrate prejudice with regard to counsel's decision not to cross-examine Bunker on this issue. On direct appeal, the Florida Supreme Court determined that Bunker's testimony relating to the blood spatter evidence was properly admitted at

Hannon's trial <u>only</u> to assist the jury in understanding the facts. *See Hannon*, 638 So. 2d at 43.

Although Hannon also claims that the trial court did not address the significance of Bunker's

testimony on the penalty phase of trial and thus overlooked the relevance of Bunker's testimony

as it pertains to the HAC aggravator, Hannon fails to state that the Florida Supreme Court

upheld the application of HAC as to both murders without relying on Bunker's blood spatter

testimony. *See Hannon*, 638 So. 2d at 43; *Hannon,* 941 So. 2d at 1123-1124.

### B. Miscellaneous Claims

Hannon contends that trial counsel failed to prepare for trial in that he did not obtain

Hannon's "rap sheet"; did not review photographs before trial; and did not cross-examine and

impeach state witnesses.  In addition, Hannon contends that trial counsel did not adequately

question jurors regarding their views on capital punishment.

Hannon claims that trial counsel failed to cross-examine state witnesses Oliver Rodz,

Lori Evans, Deputy Copeland, Deputy Shoemaker, and Omar Perez.  According to Hannon,

these witnesses either identified Hannon as the man they saw leaving the crime scene or were

involved in processing the crime scene.  According to Hannon, trial counsel also failed to

impeach state witnesses Patrick Green, Shane Cohn, Crime Scene Technician Ronald

Cashwell, Deputy Daniel McGill, Crime Scene Technician Linda Larmon, Medical Examiner

Charles Diggs, Keefe Roberts, Keith Fernandez, John J. Ring,  and Jason Rayborne.

The Florida Supreme Court, in affirming the denial of postconviction relief, found that this

claim was procedurally barred:

> Hannon in effect has chosen to contest the trial court's summary denial of
> this claim by merely listing these allegations without any supportive argument or
> authority with regard to the manner in which trial counsel's conduct was deficient
> or the prejudice he sustained. This Court has previously determined that similar
> speculative, unsupported arguments of this type are improper and for which no

relief is available. *See Cooper v. State*, 856 So. 2d 969, 977 n.7 (Fla. 2003) (rejecting similar argument as insufficient for consideration); *Sweet v. State*, 810 So. 2d 854, 870 (Fla. 2002) ("[B]ecause on appeal Sweet simply recites these claims from his postconviction motion in a sentence or two, without elaboration or explanation, we conclude that these instances of alleged ineffectiveness are not preserved for appellate review."); *see also Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues . . . ."). Therefore, we conclude that Hannon's unsupported claim is improper and deny relief on this claim.

*Hannon*, 941 So. 2d at 1139.

This Court agrees that the claim is procedurally barred. Hannon failed to present arguments in support of his claims in his postconviction appellate brief and therefore failed to preserve the claim for appellate review.[4]  Because this claim was not preserved for appellate review, the claim is procedurally barred.

A procedural default will only be excused in two narrow circumstances.  First, petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court.  *Henderson v. Campbell*, 353 F.3d at 892; *Marek*

---

[4]  In his postconviction appellate brief, Hannon claimed:

   In his 3.850 motion, Mr. Hannon alleged that trial counsel failed to conduct an adequate investigation of his case prior to trial.  Mr. Hannon detailed numerous incidents during trial where defense counsel was stating that he was learning of or reviewing evidence for the first time.  These allegations included counsel's failure to obtain Mr. Hannon's rap sheet, failure to review phhotographs before trial, failure to cross-examine and impeach state witnesses and failure to adequately question jurors regarding their views on capital punishment.  the sheer number and types of errors involved in his trial, when considered as a whole, resulted in the unreliable conviction and sentence that he received.  Mr. Hannon is entitled to an evidentiary hearing.

(App. D26/52-53).

*v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).  To show "'prejudice," Hannon must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). Hannon must show that there is at least a reasonable probability that the result of the proceeding would have been different if trial counsel had performed as Hannon now claims he should have performed. *Henderson v. Campbell*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson v. Campbell*, 353 F.3d at 892.  This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson v. Campbell*, 353 F.3d at 892. The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. 478,  495-96 (1986) (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent").  To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, " '[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) (explaining that

33

"[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted).

The *Schlup* Court stated that the petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial. *Schlup*, 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F. 3d 106, 108 (5th Cir. 1995) (denying certificate of probable cause)(footnote omitted).

Hannon has not shown cause and prejudice to overcome the procedural default and has not shown that a fundamental miscarriage of justice will occur if the Court does not reach the merits of this claim.

### C.  The Failure To Depose Ron Richardson
### and/or Request a Continuance To Investigate Ron Richardson Claim

Hannon asserts that trial counsel was deficient in failing to depose Ron Richardson after discovering during trial that Richardson was to testify against Hannon. This claim also has no merit. Hannon claims that trial counsel had a duty to investigate Richardson's relationship with Hannon and his influence on Hannon, as well as to impeach Richardson. "[W]hen a failure to depose is alleged as a part of an ineffective assistance of counsel claim, the appellant must specifically set forth the harm from the alleged omission." *Brown v. State*, 846 So. 2d 1114, 1124 (Fla. 2003) (citing *Magill v. State*, 457 So. 2d 1367, 1370 (Fla. 1984)).

At the postconviction evidentiary hearing, Hannon's trial counsel testified that the defense theory was an alibi defense, specifically that neither Hannon nor Richardson was at the crime scene when the crimes were committed, and that both Hannon and Richardson were

playing a drinking game at Richardson's house the night of the crimes. Trial counsel testified that he did not direct any investigation into Richardson's background and did not remember if he had ever obtained Richardson's criminal history before the trial began. Trial counsel further testified that he did not obtain any additional investigative material concerning Richardson's relationship with Hannon after Richardson, in a surprise move, turned to testify for the State during trial. Trial counsel stated that the trial judge offered him an opportunity to depose Richardson after the State disclosed during trial that Richardson would be presented as a witness for the State but Hannon's trial counsel decided that he would not conduct a deposition at that point because he believed Richardson's story was totally fabricated, and that his best trial strategy was to question Richardson immediately in the presence of the jury instead of creating an opportunity for Richardson to rehearse his testimony during a deposition.

Counsel cannot be deemed ineffective merely because postconviction counsel disagrees with trial counsel's strategic decisions. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . ."); *Cherry v. State*, 659 So. 2d 1069, 1073 (Fla. 1995) ("The standard is not how present counsel would have proceeded, in hindsight . . . ."). In *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."

Trial counsel, believing that the evidence would disclose to the jury that Richardson's story was clearly fabricated for purposes of obtaining the "deal" with the State, decided that his best strategy was to continue with the innocence defense and the alibi basis for the defense. Trial counsel testified at the evidentiary hearing that he consciously and strategically decided

35

that he would not depose Richardson after this last-minute turn of events because it was his strategy and approach to use the element of total surprise in questioning Richardson with regard to the details of the crime and prevent the State from using the deposition to better prepare Richardson for his trial testimony. Moreover, trial counsel related that Richardson was an integral part of Hannon's alibi defense and, thus, his strategy and goal after Richardson turned to assist the State was to demonstrate and emphasize that Richardson was not familiar with any of the details of the crime scene, thereby bolstering Hannon's argument that neither Richardson nor Hannon was at the scene and that Richardson had changed his story to procure his last-minute agreement with the State. Trial counsel also testified that he was not interested in attempting to portray Richardson as a bad person or as a guilty party before the jury because that would also undermine Hannon's alibi defense, which was predicated on Hannon's drinking with Richardson at the time of the murders. Hannon's trial counsel testified that his trial tactic and examination of Richardson was in fact ultimately successful, because on cross-examination, the defense elicited that Richardson actually knew very little with regard to the victims' apartment:

The record supports trial counsel's testimony that Richardson was unable to provide any meaningful details about the victims' apartment for the jury. The record also demonstrates that Hannon's counsel successfully revealed to the jury that Richardson had previously supported Hannon's alibi by stating that he and Hannon were playing a drinking game the night of the murders, and that he was not involved with the murder. Moreover, counsel impeached Richardson by eliciting from Richardson that up until even the night before he testified, he had denied seeing the wounds to Snider's throat, and that within the last twenty-four hours he had completely changed his story. Richardson claimed that he suddenly remembered Snider's

36

wounds. Further, when asked about his drastic change in testimony, Richardson affirmatively testified that he previously had lied not once, but several times to law enforcement. Finally, counsel highlighted to the jury that on the Sunday morning before Richardson's new testimony he was facing the death penalty for two counts of first-degree murder, but by the evening of that same day, in exchange for his testimony against Hannon, Richardson had received a "deal" for only five years in prison. (App. A10/1193-1215, 1217).

The record supports the conclusion that trial counsel had a carefully considered and planned defense strategy. Trial counsel made a strategic decision not to depose Richardson so that he could better impeach him at trial.

Moreover, Hannon has failed to demonstrate any prejudice because he has not even suggested what evidence or information trial counsel would have procured had he deposed Richardson, or conducted further investigation, that would have so affected the proceeding that confidence in the outcome would be undermined.

### D. The Failure To Question Michele Helm Claim

Hannon claims that trial counsel was ineffective for failing to question Michelle Helm, Ron Richardson's former girlfriend, regarding her July 9, 1991 deposition testimony. The state trial court denied this claim after the postconviction evidentiary hearing. The Florida Supreme Court affirmed the state trial court's denial of postconviction relief:

> Hannon contends that his trial counsel was deficient in failing to question Michelle Helm, the former girlfriend of Ron Richardson, regarding her July 9, 1991, deposition testimony. Hannon asserts that Helm testified in her deposition that Richardson was a very jealous person who was violent and had threatened to kill her, often accusing her of sleeping with other men, especially Robbie Carter and Jim Acker. At the evidentiary hearing, trial counsel testified that he was present at Helm's deposition but was not concerned with this information to attack Richardson's testimony at trial because Richardson's specific bad acts were not only irrelevant to Hannon's alibi defense, such specific bad act evidence would

not have been admissible at trial. Trial counsel testified that it was his strategy to lessen the focus on anything negative with regard to Richardson because it would be beneficial to Hannon's case with Richardson being Hannon's alibi witness until he altered his position at the end of the trial.

Moreover, trial counsel's main focus when cross-examining Richardson after the change in testimony at the last moment was to show the jury that Richardson did not remember the details of the victims' apartment, and this negative information was not necessary to bolster the argument that Richardson's story was fabricated. Based on the foregoing, Hannon has not demonstrated that trial counsel acted deficiently when he made the strategic decisions with regard to the interrogation of Helm concerning her deposition testimony and chose not to use her to attack Richardson. Hannon was not prejudiced by these decisions and accordingly, this claim has no merit.

*Hannon*, 941 So. 2d at 1124.

The standard for judging counsel's performance is "'reasonableness under prevailing professional norms.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Strickland*, 466 U.S. at 688). The test for reasonableness is not whether counsel could have done something more or different; instead, this Court must consider whether the performance fell within the broad range of reasonable assistance at trial. *Id.* As recently noted in *Stewart v. Secretary*, 476 F.3d 1193, 1209 (11th Cir. 2007), the issue is not what is possible or "what is prudent or appropriate, but only what is constitutionally compelled." (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

Trial counsel was not ineffective for failing to question Michelle Helm. Before Richardson changed his testimony and testified for the state, trial counsel's strategy was to lessen the focus on anything negative about Richardson.  Richardson was Hannon's alibi.  After Richardson changed his story, trial counsel's strategy was to show the jury that Richardson did not remember the details of the crime scene and that his changed story was fabricated. Michelle Helm's negative testimony regarding Richardson's temper was not necessary to bolster trial

38

counsel's argument that Richardson's "changed story" was fabricated.

Trial counsel's strategic decision not to question Michele Helm is "virtually unchallengable" under the Sixth Amendment. See *Wiggins*, 539 U.S. at 521-22; *Strickland*, 466 U.S. at 691. The Florida Supreme Court specifically found that counsel's strategic decisions were both informed and reasonable. The testimony from the evidentiary hearing supports these conclusions.

<u>Hannon's Defense Expert Attorney, Robert Norgard</u>

Finally, Hannon cites to the postconviction evidentiary hearing testimony of his defense "expert" attorney, Robert Norgard, to second-guess trial counsel's decisions and support Hannon's contention that trial counsel was ineffective. *See* (App. D17/3130). This claim has no merit.

Attorney Robert Norgard was called to testify as an expert at the postconviction evidentiary hearing about the standards in 1990-1991 of <u>effective</u> defense counsel at the penalty phase of a death case. He testified that Hannon's trial counsel should have investigated mitigating evidence before the trial began and should have called a mental health expert to testify on Hannon's behalf.  Norgard testified that trial counsel should have interviewed family members, reviewed Hannon's health, school, and medical records, and should have had Hannon evaluated by a mental health expert.  However, Norgard admitted that he did not know all of the facts of Hannon's case and that he was only testifying as to the community standards for presenting mitigating evidence at the penalty phase of a death case in 1990-1991. (App. D13/2558-2597).

The state trial court did not find Attorney Norgard's testimony convincing as to trial counsel's ineffectiveness for failing to investigate mitigating evidence and failing to obtain a

mental health expert and the Florida Supreme Court found that trial counsel's actions were within the realm of competent counsel.

The record supports trial counsel's postconviction testimony that a defense based on the proposition that Hannon did not commit the murders and that he was not the type of person who could have committed the murders was developed from the beginning of trial. During the guilt phase, trial counsel called Rusty Horn and Paul Kilgore to show that Hannon did not have the type of character to commit the murders and moved all of their guilt phase testimony into evidence during the penalty phase. Horn, Hannon's roommate and supervisor at his stucco job, described Hannon as a "teddy bear" type who had a reputation for nonviolence. Kilgore, another of Hannon's roommates, testified that Hannon was a nice person. Trial counsel decided it was not necessary, and likely would not have made any difference, to recall Horn and Kilgore during the penalty phase to reiterate their previous testimony.

The record also demonstrates that trial counsel presented mitigation during the guilt phase through Hannon, who testified that he attended high school through the eleventh grade; wanted to work, earn money, and learn a trade; was a hard worker; obtained a job with Rusty Horn where he received an extra fifty cents an hour if he did not drink; worked at a gas station; delivered auto parts and pizza; and visited his sister's house on Christmas and celebrated with his nieces and nephews.

Trial counsel testified at the postconviction evidentiary hearing that he had discussions with Hannon's parents and his sister Moreen, and that he sought their input with regard to Hannon's defense. According to defense counsel, Hannon's parents and sister agreed with a penalty phase strategy of emphasizing Hannon's good character and Hannon's innocence. Defense counsel testified that Hannon's parents "continued to believe their son did not and

could not do this." Counsel's adoption of a strategy that focused on Hannon's character was the product of discussions with not only Hannon, but also with his most intimate family members. According to defense counsel, Hannon and his family agreed not to pursue a strategy where, after proceeding during the guilt phase on the theory that Hannon was not present at the time of the murders, Hannon suddenly admitted, at the penalty phase, that he had committed the crimes and began offering evidence in mitigation of the murders. Defense counsel testified that he, Hannon, and his family "decided that [changing tactics] wasn't what it was going to be because Mr. Hannon was adamant. I can't tell you how much he was adamant he wasn't there." Neither Hannon nor any of his family members suggested any mitigation matters for the penalty phase. Rather, Hannon, his parents, and his sister consistently urged the strategy that counsel ultimately adopted and pursued; that is, "keep[ing] a consistent defense and a consistent position."

Defense counsel presented further evidence that Hannon did not have the type of character to commit these murders through the penalty phase testimony of Toni Acker and Hannon's mother and father. Acker testified that Hannon was "a good-time guy, carefree, liked to have fun"; that Hannon had cared for her child; and that Hannon was incapable of conduct such as these murders. Hannon's mother testified that Hannon had never hurt anyone in his entire life and that Hannon could not hurt any animal or person. Hannon's mother also pleaded with the jury, "Please, you've taken away his freedom for something he didn't do. Don't take away his life. Give us a chance, please, to prove that he never did anything like this. He couldn't." Hannon's father testified that Hannon had never been a violent person, and that he was always a "teddy bear." Hannon's father also testified that "[Hannon] says he's innocent. I believe he's innocent, and I think he ought to be given a chance to prove that he is innocent.

41

That's it." The record supports trial counsel's postconviction evidentiary hearing testimony that his penalty phase strategy was to establish that Hannon did not have the type of character to commit the murders.

Defense counsel testified at the postconviction evidentiary hearing that he was fully aware that lingering doubt was not a statutory mitigator. He  testified that he believed providing evidence during the penalty phase that Hannon did not have the type of character to commit the murders, and continuing to support the underlying innocence defense, would have a real and practical jury effect that would mitigate in favor of the jury sparing Hannon's life. Defense counsel considered this character evidence to be non-statutory mitigation, which Hannon now claims is "invalid" lingering double argument.

Attorney Norgard testified that he recognized that lingering doubt, although not a valid mitigating factor, nevertheless may be a factor in the jury's death recommendation vote and admitted that the consistent approach had a practical and real impact on a juror's vote in terms of whether to vote for life imprisonment or death. (App. D13/2558-1597).

Defense counsel's continued reliance on Hannon's claim of innocence during the penalty phase has been approved as a reasoned, strategic decision. For example, in *Chandler v. United States*, 218 F.3d 1304, 1320 (11th Cir. 2000), trial counsel focused on obtaining an acquittal and then, at sentencing, on lingering doubt.  The Eleventh Circuit specifically found that this strategy was a reasonable one and the federal appellate court relied, in part, on *Tarver v. Hopper*, 169 F.3d 710, 715-716 (11th Cir. 1999) which cited a "law review study concluding that 'the best thing a capital Defendant can to do improve his chances of receiving a life sentence . . . is to raise doubt about his guilt.' "

Although Attorney Norgard testified about the 1990-1991 standards of penalty phase

42

mitigation in a death penalty case, nothing in his testimony demonstrates that the outcome of Hannon's case would have been different had trial counsel performed according to the standards set out by Attorney Norgard.

*Strickland* does not require defense counsel to present mitigating evidence at sentencing in every case. *See Wiggins*, 539 U.S. at 533. Counsel's decision not to present mitigation evidence may be a tactical decision properly within counsel's discretion. *See Brown v. State*, 439 So.2d 872, 875 (Fla.1983) ("The choice by counsel to present or not present evidence in mitigation is a tactical decision properly within counsel's discretion."); *Valle v. State,* 705 So.2d 1331, 1335 n. 4 (Fla.1997) (same); *Gorham v. State*, 521 So.2d 1067, 1070 (Fla.1988) (same). When evaluating claims that counsel was ineffective for failing to investigate or present mitigating evidence, a defendant must show that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding." *Asay v. State*, 769 So.2d 974, 985 (Fla. 2000) (quoting *Rutherford v. State*, 727 So.2d 216, 223 (Fla.1998)). Further, as the United States Supreme Court recently stated in *Wiggins*:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
> . . . .
>
> [O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... was itself reasonable. In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."

539 U.S. at 521-23, 123 S.Ct. 2527 (citations omitted). *See Strickland*, 466 U.S. at 688-89, 691.

Investigating and presenting mental health mitigation is not always, but certainly at times, may be inconsistent with presenting an innocence defense during the penalty phase. The question is whether trial counsel's particular decision in Hannon's case not to investigate and develop mitigation was reasonable under the circumstances. *See Wiggins*, 539 U.S. at 521-22. Based on the record in this case, Hannon has not and cannot demonstrate that his trial counsel was deficient during the penalty phase because, under these circumstances, Hannon's trial counsel at the time had specific tactical and calculated reasons for the alibi and innocence strategy adopted at the guilt phase and continued into the penalty phase.

Trial counsel strategically relied on an innocence defense and Hannon agreed with this strategy.  Hannon's trial judge expressly noted that "[i]f Mr. hannon knowingly and intelligently waives his right to present mitigating evidence or circumstances, he has that right under the law."

The Eleventh Circuit has made abundantly clear, "it would not matter if a petitioner [Hannon] could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition, or by live testimony." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998).

Hannon's claims that trial counsel was ineffective for failing to present a voluntary intoxication defense and for failing adequately to investigate and prepare for trial do not warrant relief. Hannon has failed to demonstrate that the state trial court or the Florida Supreme Court acted contrary to, or unreasonably applied established federal law in rejecting  these claims.

Ground Two does not warrant federal habeas corpus relief.

Ground Three

44

**The State withheld evidence which was material and exculpatory in nature and/presented misleading evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution**

Hannon alleges that the State withheld evidence that was material and exculpatory and/or presented misleading evidence, in violation of *Brady* and/or *Giglio*, regarding the testimony of Ron Richardson and Judith Bunker. Amended Petition at 8 (Doc. 13); Supporting Facts at 8 (Doc. 13-2); Memo at 45-46 (Doc. 10).

<u>Hannon's Claim as to Ronald Richardson</u>

Hannon contends that while the State argued at Hannon's' trial that Richardson was going to spend time in prison for his role in this case, Richardson received a suspended sentence and never spent a day in jail for this offense.  According to Hannon, the Prosecution's failure to disclose that Richardson's testimony was presented in exchange for lenient treatment was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Additionally, he argues that the prosecution presented false testimony regarding Richardson's prison time in violation of *Giglio v. United States,* 405 U.S. 150 (1972).

In its order denying postconviction relief, the state trial court summarily denied Hannon's *Brady/Giglio* claim regarding Richardson's plea "deal" and sentence, finding that the claim had no merit.  (App. D6/1094-1095).   The Florida Supreme Court affirmed the state trial court's rejection of Hannon's Brady/Giglio claim. *Hannon,* 941 So. 2d at 1140-41.

 To demonstrate a *Brady* violation, Hannon must allege specific facts that, if accepted as true, establish a prima facie case that (1) the State possessed evidence favorable to the accused because it was either exculpatory or impeaching; (2) the State willfully or inadvertently suppressed the evidence; and (3) the defendant was prejudiced. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Allen v. State*, 854 So. 2d 1255, 1259 (Fla. 2003).

To establish a *Giglio* violation, Hannon must demonstrate that (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. *See Guzman v. State*, 868 So. 2d 498, 505 (Fla. 2003); *Ventura v. State,* 794 So. 2d 553, 562 (Fla. 2001).

Hannon's claim fails because he has not alleged any facts to show that there was either a *Brady* or a *Giglio* violation with regard to Richardson's testimony.  The fact that Richardson did not serve five years in Florida State Prison due to gain time awarded by the Department of Corrections does not prove that the State suppressed evidence or presented false testimony. The award and forfeiture of statutory gain time is a function of the Department of Corrections, not the Court. *See Harvey v. State*, 616 So. 2d 521 (Fla. 2d DCA 1993).

There is no indication that the State suppressed evidence relating to its agreement with Richardson. The record reveals that Richardson approached the State to negotiate an agreement, the State came to an agreement with Richardson on a Sunday evening, and the next morning the State informed Hannon's trial counsel and the state trial court of the plea agreement. The record facially reflects that Hannon's trial counsel knew of the agreement at the time of the trial. These facts conclusively refute the contention that *a Brady* violation occurred. *See Tompkins v. State*, 872 So. 2d 230, 239 (Fla. 2003) ("Because defense counsel knew of the report . . . a *Brady* violation is conclusively refuted."); *see also Foster v. State*, 810 So. 2d 910, 916 (Fla. 2002); *Bryan v. State*, 748 So. 2d 1003, 1008 (Fla. 1999)."

Hannon also fails to demonstrate a *Giglio* violation with regard to Richardson's testimony relating to what occurred on the night of the murders. Hannon simply asserts that Richardson's testimony was fabricated without additional facts, or any facts that the State knew Richardson's testimony was false. Hannon has not provided a factual basis to demonstrate that the State

46

instructed Richardson to lie with regard to what occurred on the night of the murders, or that Richardson did lie.

There is no basis for a finding that the state courts either ignored or unreasonably applied prevailing federal law in the rejection of Hannon's *Brady/Giglio* claims. Moreover, Hannon has not rebutted, by clear and convincing evidence, the state court's dispositive factual finding that "the record facially supports the conclusion" that the jury was in fact informed that with his gain time, Richardson might not actually spend five years in prison. In this case, Hannon failed to show that the State suppressed "any evidence that Richardson might not serve time in jail after his gain time was calculated or that it misrepresented to the jury the length of time Richardson was expected to actually serve for his participation in the murders." *Hannon*, 941 So. 2d at 1140-1141. Hannon has not demonstrated that the Florida courts either ignored or unreasonably applied prevailing federal law in the rejection of Hannon's *Brady/Giglio* claims.

<u>Hannon's Claim as to Judith Bunker</u>

Hannon claims that the State presented unreliable testimony and evidence through Judith Bunker, the State's blood-spatter expert. According to Hannon, Bunker's qualifications as an expert in the field of blood spatter were misrepresented. (Hannon alludes to Ground Two). He claims that, to the extent that the State failed to disclose this information and/or presented misleading testimony, the State violated *Brady* and *Giglio*.

The state trial court summarily denied postconviction relief on the issue of Judith Bunker's qualifications, stating:

> Third, Defendant claims the State presented unreliable testimony and evidence through Judith Bunker, whom the Court qualified as a blood-spatter expert. Specifically, Defendant claims Ms. Bunker's "qualifications" as an expert in the field of blood spatter were misrepresented. However, Defendant has failed to prove that the State was aware that Ms. Bunker misrepresented her

qualifications. Moreover, the Florida Supreme Court in *Correll v. State*, 698 So. 2d 522 (Fla. 1997), held that Ms. Judith Bunker's exaggeration of her credentials did not warrant relief. The Florida Supreme Court in *Correll* stated that "the discrepancies between the level of education, training, and experience Bunker testified to at trial and the asserted level of education, training, and experience she actually had were not so great as to make any difference in the outcome of the case." *Id.* at 524.

On July 19, 1991, in Defendant's case, Ms. Judith Bunker testified to [sic] regarding her extensive training, education, and experience. (See Trial Transcript, Volume X, pages 1076-1083, attached). Similar to *Correll,* this Court finds that Ms. Judith Bunker's exaggeration of her credentials is not prejudicial when Ms. Bunker's testimony was based on her extensive experience in the field of blood spatter analysis. (See Trial Transcript, Volume X, pages 1076-1126, attached). As such, no relief is warranted upon this portion of claim III.

(App. D6/1099).

The Florida Supreme Court affirmed the denial of postconviction relief as to Hannon's

*Brady/Giglio* claim regarding Judith Bunker, stating:

Hannon further claims that the trial court erred in summarily denying the following claims with regard to Bunker: trial counsel was ineffective for failing to investigate Bunker's background, the State presented unreliable and nonscientific blood spatter testimony through Bunker, and the State's failure to disclose Bunker's qualifications and misrepresentations of Bunker's qualifications as an expert in the field of blood spatter constituted a *Brady* and *Giglio* violation. A criminal defendant alleging a *Brady* violation bears the burden to show prejudice, i.e., to show a reasonable probability that the undisclosed evidence would have produced a different verdict. *See Strickler v. Greene*, 527 U.S. 263, 281 n.20, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). To demonstrate prejudice under *Giglio* it must be established that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Hannon has failed to demonstrate prejudice relating to any aspect of Bunker's testimony sufficient to establish either a *Brady* or *Giglio* violation. Therefore, the trial court's rejection of these claims was not improper.

*Hannon*, 941 So. 2d at 1124.

The state trial court found that Ms. Bunker's exaggeration of her credentials was not

prejudicial when her testimony was based on her extensive experience in the field of blood

spatter analysis.  Trial counsel confirmed that her testimony was not harmful to Hannon, and his "tactical decision not to challenge or impeach Bunker's blood spatter testimony was reasonable because it [her testimony] did not implicate Hannon in the murders, nor was it even an element in the State's case against Hannon." *Hannon*, 941 So. 2d at 1122.  If there were any error caused by withholding evidence of Bunker's credentials or presenting "false testimony" as to her credentials, the error was harmless under *Brecht.* No violation of any clearly established federal law has been demonstrated, and this claim fails under AEDPA.

Ground Three does not warrant federal habeas corpus relief.

Ground Four

**Mr. Hannon was denied due process when unreliable and unscientific evidence was presented at trial in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution and in violation of *Frye v. United States***

Hannon asserts that he was denied "due process" when allegedly unreliable and "non-scientific" blood stain pattern evidence was presented at trial in violation of *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923). Hannon also summarily cites to *Brady, Giglio*, and *Bagley*, as well as noting a subsidiary IAC complaint. Amended Petition at 9 (Doc. 13); Supporting Facts at 9-10 (Doc. 13-2); Memo at 47-48 (Doc. 10).

Hannon contends that trial counsel failed properly to voir dire Bunker, and as a result, she was qualified as a blood stain pattern expert. Hannon contends that because trial counsel failed to object to her qualifications, the trial court had no reason to question whether Bunker's reasoning or methodology underlying her testimony was scientifically valid and whether that reasoning or methodology properly could be applied to the facts in issue.

Hannon contends that Bunker should never have been qualified as an expert because

49

she lacked the scientific training, knowledge and skills to perform blood stain pattern analyses. The reliability of her materially inaccurate testimony undermined the reliability of Hannon's convictions and sentence especially because her testimony provided the basis for the heinous, atrocious, and cruel aggravating factor. Hannon claims that had the jury known that Bunker's testimony was false and/or misleading, that she was not an expert in any field, and that her conclusions were without any scientific basis, the jury could have reached a different result as to Hannon's guilt.

Hannon admits that no *Frye* objection was raised at trial and that this claim was not raised on direct appeal. Amended Petition at 10 (Doc. 13). Therefore, Hannon's *Frye* claim is procedurally barred.  Hannon attempts to show cause and prejudice to overcome the procedural default in his reply to Respondent' response to the federal habeas petition.  Hannon alleges that the claim could not have been raised on direct appeal because trial counsel did not preserve it for review and the ineffective assistance of trial counsel in failing to preserve this claim for direct appeal constitute cause that excuses the procedural default.

Hannon's argument for overcoming the procedural default is not persuasive because Bunker's testimony with regard to the blood spatters did not link Hannon to the crime scene. *See Hannon,* 941 So. 2d at 1123 n7.  Trial counsel testified at the postconviction evidentiary hearing that (1) he chose not to question Bunker's credentials at trial to avoid giving the jury the impression that he was attempting to present an inconsistent defense; and (2) Bunker's testimony did not adversely impact Hannon's defense because Bunker was never able to confirm that any of the victims' blood was on Hannon.

In addition, Hannon's argument that the state trial court did not address the significant effect of Bunker's testimony on the penalty phase of the trial and thus overlooked the relevance

of Bunker's testimony as it pertained to the HAC aggravator is not persuasive. The state trial court upheld the application of the HAC aggravator as to both murders without relying on Bunker's blood spatter testimony. *See Hannon*, 638 So.2d at 43.

Hannon has not shown that trial counsel was ineffective for failing to raise a *Frye* issue. Therefore, trial counsel's failure to preserve this claim for review on direct appeal cannot serve as cause or prejudice to overcome the procedural default.

Intertwined Claims

In his state postconviction proceedings, Hannon also raised various intertwined *Brady* and IAC claims predicated on his underlying complaint that the State allegedly presented "unreliable and nonscientific" blood spatter evidence. In summarily denying Hannon's intertwined claims for postconviction relief (state postconviction claims III, IV, and V), the state trial court found that Hannon failed to prove that the State was aware that Bunker misrepresented her qualifications.  The state trial court also pointed out that the Florida Supreme Court, in *Correll v. State*, 698 So. 2d 522 (Fla. 1997), held that Bunker's exaggeration of her credentials did not warrant relief.  The *Correll* Court stated that "the discrepancies between the level of education, training, and experience Bunker testified to at trial and the asserted level of education, training, and experience she actually had were not so great as to make any difference in the outcome of the case." *Id.* at 524.

(App. D6/1099)

The Florida Supreme Court found that Bunker's testimony relating to the blood splatter evidence was presented to assist the jury in understanding the facts before it. The clothing was admitted into evidence and used by Bunker to explain how the murders occurred. The splatter evidence was consistent and tied in with other evidence detailing the manner of commission

51

of the crime. *Hannon v. State*, 638 So. 2d 39, 43 (Fla. 1994). Therefore, the Florida Supreme Court found Bunker's testimony admissible. Id.

"A trial court's ruling regarding the admissibility of evidence will not be disturbed absent an abuse of discretion." *Hannon v. State*, 638 So. 2d 39, 43 (Fla. 1994)(citing *Blanco v. State*, 452 So. 2d 520, 523 (Fla. 1984), *cert. denied*, 469 U.S. 1181 (1985)). The Florida Supreme Court, on direct appeal, found that this Court did not abuse its discretion in admitting Ms. Bunker's testimony regarding blood spatter analysis. *Id.* at 43. Therefore, Defendant's claims regarding the admissibility of Ms. Bunker's testimony are without merit.

The state trial court found, on postconviction, that Hannon had failed to prove either a *Brady* violation or a *Giglio* violation because he failed to prove that evidence was suppressed by the State or that the State presented false testimony. (App. D6/1103-1105).

The state trial court reserved ruling on Hannon's IAC claim, but found that Hannon's remaining postconviction claims related to the presentation of unreliable testimony and non-scientific evidence were without merit. (App D6/1125-1127). On postconviction appeal, the Florida Supreme Court affirmed the state trial court's summary denial of Hannon's challenge to the blood spatter testimony and intertwined *Brady/Giglio* claims finding that Hannon had failed to demonstrate prejudice relating to any aspect of Bunker's testimony sufficient to establish either a *Brady* or *Giglio* violation. *Hannon*, 941 So. 2d at 1123-1124.

After the postconviction evidentiary hearing, the state trial court issued a final order on Hannon's postconviction claims and stated that Hannon was not entitled to relief on ineffective assistance of counsel claim related to his intertwined IAC/blood spatter claims:

> Defendant claims counsel failed to adequately challenge Ms. Bunker's testimony through cross-examination, counsel failed to depose Ms. Bunker, counsel failed to retain experts to testify in rebuttal, and counsel failed to object

to the errors outlined in claim V. With respect to counsel's alleged failure to adequately challenge Ms. Bunker's testimony through cross-examination, at the February 18, 2002 evidentiary hearing, Mr. Episcopo testified that attacking Ms. Bunker would not have helped the defense because her testimony was irrelevant and did not hurt Defendant's case. (See February 18, 2002 Transcript, pages 40 and 46, attached). Moreover, Mr. Episcopo testified that Ms. Bunker did not have anything against Defendant, she did not put any of the victims' blood on Defendant, the State did not need her for their case, and he had no intention of attacking her. (See February 18, 2002 Transcript, page 113, attached). Consequently, Defendant has failed to meet the first prong of *Strickland* in that he has failed to prove how counsel acted deficiently when he made a strategic decision to not extensively challenge Ms. Bunker's testimony through cross-examination. Since Defendant has failed to meet the first prong of *Strickland*, it is unnecessary to address the prejudice component. *See Downs v. State*, 740 So. 2d 506, 518 n. 19 (Fla. 1999). As such, no relief is warranted upon this portion of claim V.

With respect to counsel's alleged failure to depose Ms. Bunker, at the February 18, 2002 evidentiary hearing, Mr. Episcopo testified that although he received Ms. Bunker's Curriculum Vitae prior to trial, he did not recall deposing Ms. Bunker prior to trial. (See February 18, 2002 Transcript, page 35, attached). However, Mr. Episcopo testified that he never questioned Ms. Bunker's credentials because he didn't want to give the jury the impression that he was impeaching a witness that was not relevant to the alibi defense, and questioning her extensively would have had nothing to do with the alibi defense. (See February 18, 2002 Transcript, pages 34 - 35, attached).

Moreover, Mr. Episcopo testified that Ms. Bunker did not have anything against Defendant, she did not put any of the victims' blood on Defendant, the State did not need her for their case, and he had no intention of attacking her. (See February 18, 2002 Transcript, page 113, attached). Consequently, Defendant has failed to meet the first prong of *Strickland* in that he has failed to prove how counsel acted deficiently when he made a strategic decision not to depose Ms. Judith Bunker. Since Defendant has failed to meet the first prong of *Strickland*, it is unnecessary to address the prejudice component. *See Downs v. State,* 740 So. 2d 506, 518 n. 19 (Fla. 1999). As such, no relief is warranted upon this portion of claim V.

With respect to counsel's alleged failure to retain experts to testify in rebuttal, at the February 18, 2002 evidentiary hearing, Mr. Episcopo testified that attacking Ms. Bunker would not have helped the defense because her testimony was irrelevant and did not hurt Defendant's case. (See February 18, 2002 Transcript, pages 40 and 46, attached). Moreover, Mr. Episcopo testified that Ms. Bunker did not have anything against Defendant, she did not put any of the victims' blood on Defendant, the State did not need her for their case, and he had

no intention of attacking her. (See February 18, 2002 Transcript, page 113, attached). Consequently, Defendant has failed to meet the first prong of *Strickland* in that he has failed to prove how counsel acted deficiently when he made a strategic decision not to retain experts to testify in rebuttal. Since Defendant has failed to meet the first prong of *Strickland*, it is unnecessary to address the prejudice component. *See Downs v. State*, 740 So. 2d 506, 518 n. 19 (Fla. 1999). As such, no relief is warranted upon this portion of claim V.

With respect to counsel's alleged failure to object to the errors outlined in claim V, based on the Court's ruling on the remainder of claim V, no relief is warranted upon this portion of claim V.

(App. D10/2016-2017).

The Florida Supreme Court affirmed the denial of relief on this claim, stating:

Hannon further claims that the trial court erred in summarily denying the following claims with regard to Bunker: trial counsel was ineffective for failing to investigate Bunker's background, the State presented unreliable and nonscientific blood spatter testimony through Bunker, and the State's failure to disclose Bunker's qualifications and misrepresentations of Bunker's qualifications as an expert in the field of blood spatter constituted a *Brady* and *Giglio* violation. A criminal defendant alleging a *Brady* violation bears the burden to show prejudice, *i.e.*, to show a reasonable probability that the undisclosed evidence would have produced a different verdict. *See Strickler v. Greene*, 527 U.S. 263, 281 n.20, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999). To demonstrate prejudice under *Giglio* it must be established that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Hannon has failed to demonstrate prejudice relating to any aspect of bunker's testimony sufficient to establish either a *Brady or* Giglio violation.  Therefore, the trial court's rejection of these claims was not improper.

*Hannon*, 941 So. 2d at 1123-1124.

Hannon's *Frye* claim could have been raised at trial and on direct appeal. It was not and is now procedurally barred. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991). In rejecting Hannon's intertwined *Brady/Giglio* claims, the state trial court and the Florida Supreme Court found that Hannon failed to establish that any evidence was suppressed by the State or that the State knowingly presented any material false testimony. At trial, and even in the present

petition, Hannon does not seriously dispute that the victims' blood actually was spattered at the crime scene. Downstairs, Brandon Snider was stabbed until his "guts" literally were "hanging out" and, then, Snider was nearly decapitated. Upstairs, Robbie Carter was shot six times in the torso, at close range. However, as defense counsel emphasized at trial, and reiterated in postconviction testimony, the blood spatter expert did not link Hannon to the murders. Consequently, defense counsel concluded that Judith Bunker's testimony was irrelevant and that a *Frye* hearing was not necessary.[5] (App. D11/2092).

To establish that there was a *Brady* violation, Hannon must prove that: (1) the government possessed evidence favorable to him; (2) he did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material. *LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1268 (11th Cir. 2005). To satisfy *Brady*'s materiality standard, Hannon must demonstrate a reasonable probability that, had the allegedly favorable evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the government's evidentiary suppression "'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  Hannon has not identified any specific error in the state court's comprehensive and fact-specific analyses nor has he otherwise supported his conclusory assertions. The facts as found by state trial court affirmatively refute the allegation that the State failed to disclose

---

[5] Even where blood spatter evidence does not directly link a defendant to the murder, it may be introduced at trial to indicate the victim's position at the time of the crime. *See e.g., Grossman v. McDonough*, 466 F.3d 1325, 1332, n.7 (11th Cir. 2006) (noting that investigator from the medical examiner's office testified regarding the blood spatter evidence that indicated the victim's position when shot); *Zakrzewski v. McDonough,* 455 F.3d 1254, 1256 (11th Cir. 2006) (stating that the expert testified that the blood spatters from the five-year old victim showed that she was kneeling over the bathtub when she was struck by the machete).

exculpatory, material evidence or presented material false evidence. No United States Supreme Court precedent was misapplied in the state court's rejection of this claim.

Ground Four does not warrant habeas corpus relief.

Ground Five

**Mr. Hannon's trial counsel was operating under a conflict of interest that rendered his representation of Mr. Hannon unconstitutional and violated Mr. Hannon's rights under the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution and the corresponding provisions of the Florida Constitution**

Hannon asserts that trial counsel, Joe Episcopo, was operating under a purported conflict of interest. Amended Petition at pp. 10-11 (Doc. 13-2); Memo at 49 (Doc. 10).  Hannon claims Episcopo pursued co-defendant Richardson in an attempt to represent both co-defendant Richardson and Hannon, although Episcopo knew that co-defendant Richardson was represented by another attorney.[6]

In summarily denying this postconviction claim, the state trial court specifically found that the facts that formed the basis for the alleged "conflict of interest" claim were known to Hannon at the time of his trial, and therefore, could have been raised on direct appeal.  In fact, they were apparent on the face of the record. The conflict of interest claim was not raised at trial or on direct appeal. (App. D6/1129-1132).

The Florida Supreme Court affirmed the state trial court's summary denial of postconviction relief, finding that this claim was procedurally barred because the alleged conflict of interest was known to Hannon at the time of his trial and, therefore, could have been, and should have been, raised on direct appeal. *Hannon*, 941 So. 2d at 1141.

---

[6] Richardson was never represented by Attorney Episcopo. Attorney Nick Sinardi represented Richardson throughout this criminal prosecution.

56

Ground Five was procedurally barred in state court and is procedurally barred in this Court. Hannon has not shown cause and prejudice to overcome the procedural bar. Nor has he shown that a miscarriage of justice will occur if this Court does not reach the merits of this claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Parker v. Secretary for the Department of Corrections*, 331 F.3d 764, 770-71 (11th Cir. 2003).

Even if the claim were not procedurally barred, Hannon's conflict of interest claim has no merit. To prove a claim that an actual conflict of interest existed between a Defendant and his counsel, the Defendant must show that his counsel actively represented conflicting interests and that the conflict adversely affected counsel's performance. *Quince v. State*, 732 So. 2d 1059, 1063 (Fla. 1999).

Also, to show a violation of the right to conflict-free counsel, a defendant must establish that an *actual conflict* of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *Freund v. Butterworth*, 165 F.3d 839 (11th Cir. 1999) (en banc). "Until a defendant shows that his counsel *actively represented* conflicting interests," he has not established a violation of the Sixth Amendment. *Cuyler v. Sullivan*, 446 U.S. at 350.[7] In *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court again emphasized that until "a defendant shows that his counsel *actively represented conflicting interests*, he has not established the constitutional predicate for his claim of ineffective assistance." 535 U.S. at 175 (quoting *Cuyler v. Sullivan*, 446 U.S. at 350).

More importantly, "[t]here is no Supreme Court decision holding that any kind of presumed

---

[7] In *Cuyler v. Sullivan*, the Supreme Court held that, in cases of *concurrent multiple representation*, a defendant is presumed to be prejudiced where he can show (1) "that his counsel actively represented conflicting interests" *and* (2) that the conflict "adversely affected his lawyer's performance." 446 U.S. at 350.

prejudice rule applies outside the multiple representation context." *Schwab v. Crosby*, 451 F.3d 1308, 1327 (11th Cir. 2006).[8] Attorney Episcopo never represented co-defendant Richardson; therefore, this case did not involve any issue of concurrent multiple representation. Episcopo never actively represented Richardson during his representation of Hannon.

Hannon claims that counsel was blinded to pursuing avenues of investigation that might have pointed to the co-defendant Richardson's role in the killings. However, Hannon has failed to specifically allege what evidence may have been available to show that co-defendant Richardson's role was more significant than Hannon's.

Hannon also claimed that counsel's attempting to represent co-defendant Richardson clouded counsel's ability to effectively cross-examine Richardson. A review of Episcopo cross-examination reflects that Episcopo impeached Richardson several times with prior statements Richardson made. Moreover, Episcopo was able to get Richardson to testify that he had changed his story and had previously lied about where he was at the time of the murders.  The trial transcript demonstrates that defense counsel effectively cross-examined Mr. Richardson. (App. A10/1193-1218).

Hannon's claim of purported conflict was known by him at the time of trial and was not raised, and therefore, was deemed procedurally barred on postconviction by the state trial court. That decision was affirmed by the Florida Supreme Court. Hannon's alleged "conflict of interest"

_____

[8] In *Schwab*, the Eleventh Circuit emphasized, "[a]t the time Schwab's conviction became final there was--and even since then there has been--no Supreme Court decision holding that prejudice should be presumed to any extent where the attorney's asserted conflict of interest does not arise from concurrent multiple legal representation. That's the whole thing under § 2254(d)(1). For these reasons, a decision that *Sullivan*'s limited presumption of prejudice does not apply in this context is not 'contrary  to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.' 28 U.S.C. § 2254(d)(1). Nor is a failure to extend the *Sullivan* rule to this new context unreasonable either." *Schwab,* 451 F.3d at 1328.

claim is procedurally barred for federal review because the last state court rendering judgment found the claim to be procedurally defaulted, and Hannon fails to demonstrate cause and prejudice to excuse the default. *See, Harris v. Reed*, 489 U.S. 255, 262 (1989). Additionally, Hannon's speculative claim of alleged conflict of interest is meritless. Hannon has not identified any actual conflicting interest under which Episcopo operated at any time at trial, nor has he identified any possible prejudice.

Ground Five does not warrant habeas corpus relief.

Ground Six

**The State's use of jailhouse informants violated Mr. Hannon's Fifth, Sixth, Eighth and Fourteenth Amendment rights and counsel's failure to object constituted prejudicially ineffective representation**

Hannon contends that the State's use of "jailhouse informants" allegedly violated Hannon's Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Amended Petition at pp. 12-14 (Doc. 13-2); Memo at 50 (Doc. 10).

Hannon claims that Keith Fernandez told a "police officer" that Fernandez could get information "out of Hannon," and that Fernandez was sent to jail to do that.  Hannon also alleges that Jonathan Ring was a jailhouse informant who testified against Hannon in exchange for the restoration of his gain time while Ring was out of prison for Hannon's trial.  Hannon contends that trial counsel was ineffective because he did not discover any evidence of the undisclosed "deals," and specifically that counsel was ineffective for failing to discover that state investigator Scott Hopkins wrote a letter on September 6, 1991 to the superintendent of the prison where Ring was house requesting that gain time Ring lost while waiting to testify be reinstated.

Hannon failed to provide a factual basis for his allegation that the State made undisclosed concessions or guarantees of favors to either Fernandez or Ring in return for information against

Hannon, or that either Fernandez or Ring were agents of the State. Based on the record, the trial court properly found that Hannon was not entitled to relief and therefore, summary denial of postconviction relief was appropriate.  The Florida Supreme Court affirmed the state trial court's denial of relief on this claim. *See Hannon,* 941 So. 2d at 1142.

Furthermore, Hannon's claim is insufficiently pled. Aside from a single, perfunctory citation to *Maine v. Moulton*, 474 U.S. 159 (1985), Hannon does not fairly identify, in his petition, any prevailing federal law from the United States Supreme Court which was allegedly ignored or misapplied by the state courts' rejection of this issue. The cases that were summarily cited on pages 89-90 of Hannon's initial postconviction brief in state court were *United States v. Henry*, 447 U.S. 264 (1980), *Massiah v. United States*, 377 U.S. 201 (1964),[9] and *Maine v. Moulton*, 474 U.S. 159, 176 (1985). These cases are not on point or are factually different from Hannon's case.

Hannon has not refuted, by clear and convincing evidence,[10] the state trial court's factual findings that "Defendant has failed to prove any inmate was offered anything in exchange for their [sic] testimony. Moreover, Defendant has failed to prove the State encouraged the jailhouse informants to testify falsely."  (App. D6/1137). The record affirmatively refutes his claim as to state trial court error. Furthermore, Hannon has not shown that counsel was ineffective under the *Strickland* standard.  Since Fernandez and the other inmate witnesses were not agents of the State, counsel was not ineffective for failing to raise this nonmeritorious issue. See *Parker v. State*, 611 So. 2d 1224, 1227 (Fla. 1993).

---

[9] Hannon cites *Henry and Massiah* in his reply to Respondent's response, but does not analogize the facts to the facts of Hannon's case.

[10] See 28 U.S.C. § 2254(e)(1).

Ground Six does not warrant habeas corpus relief.

Ground Seven

**The State's use of misleading testimony and improper argument undermined the reliability of the outcome of Mr. Hannon's capital trial in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and the corresponding provisions of the Florida Constitution**

Hannon asserts that two of the prosecutor's comments during closing argument were improper and that the State allegedly presented false testimony and comments regarding the amount of time that Hannon's co-defendant, Ron Richardson, would spend in prison. Amended Petition at 14-15 (Doc. 13-2), Memo at 50 (Doc. 10).

Prosecutor's Comments at Trial

Hannon asserts that the following "slaughterhouse" arguments made by the State during the guilt phase closing argument and were not supported by any factual basis:

> If I had to think of a name for this case, something to summarize what this case is all about, the name I would choose would be "The Slaughterhouse. The Slaughterhouse." Because on January 10, 1991, a man sitting in this very courtroom, turned the home of Brandon Snider and Robbie Carter into a slaughterhouse.
>
> . . . .
>
> Hannon worked at a slaughterhouse. Hannon had access to knives. He had access to knives. He used knives in the past to kill. He testified on the stand that he killed before, killed animals before.[11]

---

[11] The record demonstrates that the State's "slaughterhouse" arguments were supported by the evidence. Specifically, John Ring testified at trial that Hannon stated the following:

> [Hannon] said that the cops were trying to pin a murder on him, that they had--they wanted to pin him because he had worked in a slaughterhouse and he was cutting throats for a living, because that made him a violent person, that they were trying to pin that on him and that he had shot this guy six times.

> Moreover, at trial Hannon testified that he worked in a slaughterhouse in
> (continued...)

61

(App. A12/1457, 1479)

Additionally, Hannon asserts that trial counsel's failure to object to the following argument made by the State during closing argument was unreasonable:

"[S]ometimes you need to make a deal with a sinner in order to get the devil. That's what we did in this case. Ron Richardson did wrong. He was a sinner. We dealt with him to get the devil."

(App. A12/1613)

Hannon admits that he did not challenge the prosecutor's comments at trial and on direct appeal. Amended Petition at 15 (Doc. 13-2). Therefore, any claims concerning the prosecutor's comments at trial are procedurally barred. *See, Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Hannon has not shown cause and prejudice to overcome the procedural default and has not shown that a fundamental miscarriage of justice will occur if this Court does not reach the merits of this claim.

Hannon did raise a similar claim in the state court in his postconviction proceedings, under the guise that the State allegedly presented false evidence and misleading argument. The Florida Supreme Court rejected, on the merits, Hannon's dual claims that the prosecutor's comments were improper and that the prosecutor misrepresented Richardson's sentence. The

---

[11](...continued)
Okeechobee slaughtering cows, and in Brooksville slaughtering pigs and hogs. Hannon described that he would shock the animals, make an incision in them, and hang them upside down to bleed them. Hannon testified in detail with regard to what occurred on certain days at the slaughterhouse, including that Mondays and Wednesdays were slaughter days when they killed the hogs. Hannon described the different functions related to cutting, specifically that if you were right-handed you would have the knife in your right hand and grab the meat with your left hand. Hannon also testified that he had taken a pork loin to Robbie Carter's house, boned it out, and cut some pork chops. Hannon further testified that during the time January 14 through 16, he had attempted to secure work with Richardson at the slaughterhouse but could not because business was slow.  There was testimony regarding Hannon's work in the slaughterhouse to support the State's analogy.

Florida Supreme Court found that there was testimony regarding Hannon's work with knives in a slaughterhouse to support the State's analogy of Hannon's case to a slaughterhouse.  The Florida Supreme Court also found that the State's comment during closing argument "that they made a deal with the sinner to get the devil was not so prejudicial as to undermine our confidence in the case." *Hannon*, 941 So. 2d at 1142-1144.

Even if the prosecutor's comments and argument were not procedurally barred because they were not objected to at trial and not raised on direct appeal, they would not warrant habeas relief. The Florida Supreme Court's ruling that the prosecutor's comments were proper when read in context is entitled to great deference. Hannon has failed to meet his burden under AEDPA of showing that the state court's ruling on this matter was contrary to any clearly established law as determined by the United States Supreme Court or was an unreasonable application of such clearly established law.

<u>False Testimony as to Richardson's Prison Sentence</u>

The Court previously discussed this issue. See Ground Three above. The claim has no merit.

Ground Seven does not warrant habeas corpus relief on either the State's improper argument claim or the misleading testimony claim.

Ground Eight

**The avoid arrest aggravator is vague and improperly applied at Mr. Hannon's trial in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution**

Hannon asserts that the "avoid arrest" aggravator is vague and was improperly applied at his trial. Amended Petition at 15-17 (Doc. 13-2); Memo at 50-51 (Doc. 10).  The state trial court found this aggravating factor as to victim Carter, only: that Carter's murder was committed

to avoid or prevent a lawful arrest. §921.141 (5)(e), Fla. Stat. (1991). *Hannon*, 638 So. 2d at 41.

## Vagueness Challenge

Hannon admits that his <u>vagueness</u> challenge to the "avoid arrest" aggravator was not raised at trial and on direct appeal. Amended Petition at 16 (Doc. 13-2). Therefore, that claim is procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Hannon has not shown cause and prejudice to overcome the procedural default and has not shown that a fundamental miscarriage of justice will occur if this Court does not reach the merits of this claim.

Furthermore, the Florida Supreme Court stated:

> Procedural bar notwithstanding, this claim is meritless because this Court has previously upheld the constitutionality of the standard jury instruction for the avoid arrest aggravator. *See Griffin v. State*, 866 So. 2d 1, 16 (Fla. 2003); *Sweet v. Moore*, 822 So. 2d 1269, 1274 (Fla. 2002); *see also Whitton v. State*, 649 So. 2d 861, 867 n.10 (Fla. 1994) (concluding that the standard jury instruction for avoid arrest aggravator is not unconstitutionally vague and did not require a limiting instruction to make this aggravator constitutionally sound). Therefore, this claim is denied.

*Hannon*, 941 So. 2d at 1146-1147.

## Application Challenge

On direct appeal, Hannon did challenge <u>the application of the avoid arrest aggravator</u>, but only on the ground that the evidence allegedly did not support the aggravating circumstance that the murder of Carter was committed for the purpose of avoiding or preventing lawful arrest. *See Hannon*, 638 So. 2d at 44. On direct appeal, the Florida Supreme Court stated: "the finding that Carter was murdered for the purpose of avoiding or preventing lawful arrest is fully supported by the record." *Id.*

The Eleventh Circuit has long recognized that deference must be given to the Florida courts' application of their own law, including the application of the "avoid arrest" aggravator. *See*

*Funchess v. Wainwright*, 772 F.2d 683, 692 (11th Cir. 1985). The Florida Supreme Court's findings are undeniably entitled to deferential review under § 2254. Hannon has not cited any United States Supreme Court case with materially indistinguishable facts, and Hannon has failed to demonstrate that the Florida Supreme Court's ruling was contrary to or an unreasonable application of any clearly established federal law.

Ground Eight does not warrant federal habeas corpus relief.

Ground Nine

**Mr. Hannon was denied his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution when the court found the automatic aggravating factor that the murder occurred during the commission of a felony**

Hannon's next claim is that the jury instruction on the aggravating factor of "during the course of a felony," constituted an "automatic" aggravator. Amended Petition, pp. 17-18 (Doc. 13- 2); Memo, 51-52 (Doc. 10). In sentencing Hannon to death, the trial judge found three aggravating circumstances that were applicable to the murders of Brandon Snider and Robbie Carter: (1) previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel (HAC). § 921.141 (5)(a), (d), and (h), Fla. Stat. (1991). *Hannon,* 638 So. 2d at 41.

Hannon admits that his "automatic aggravator" claim was not raised at trial and was not raised on direct appeal. Amended Petition at 17 (Doc. 13-2). Accordingly, the claim is procedurally barred. *See, Mills v. Singletary*, 161 F.3d 1273 (11th Cir. 1998) (holding that Mills had procedurally defaulted his "automatic aggravator" claim, and further noting that the Eleventh Circuit has considered this [automatic aggravator] argument previously and found it to be

meritless.) *Id.* at 1287 (citing *Johnson v. Dugger*, 932 F.2d 1360, 1368-70 (11th Cir.), *cert. denied*, 502 U.S. 961,(1991)); *Bertolotti  v. Dugger*, 883 F.2d 1503, 1527-28 (11th Cir. 1989), *cert. denied*, 497 U.S. 1032 (1990).

In his state postconviction motion, Hannon sought to resurrect this procedurally barred claim by asserting that the state trial court erroneously found one of the aggravators to be that the murder occurred during the commission of a felony, and that the finding was an automatic aggravating factor. *See Hannon*, 941 So. 2d at 1118. Hannon also argued that the failure to raise an "automatic aggravator" objection at trial constituted ineffective assistance of trial counsel.

In affirming the trial court's summary denial of postconviction relief, the Florida Supreme Court explained:

> The trial court summarily denied Hannon's claims that trial counsel was ineffective in failing to object to what he contends were constitutional errors. Hannon now asserts the following: (1) the burden of proof was improperly shifted to Hannon during the penalty phase; (2) Hannon's jury was repeatedly instructed by the court and the prosecutor that its role was advisory and simply a recommendation, diminishing the jury's sense of responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); and (3) instructing the jury that they could find as an aggravating circumstance the fact that Hannon was engaged in the commission of the crime of burglary based upon the State's alternative theory of felony murder rendered him automatically eligible for the death penalty. The trial court properly denied this claim because all of the individual assertions fail because they are procedurally barred or without legal merit. *See Power v. State*, 886 So. 2d 952, 956 (Fla. 2004); *Freeman v. State*, 761 So. 2d 1055, 1067 (Fla. 2000); *Blanco v. State*, 706 So. 2d 7, 11 (Fla. 1997); *Johnson v. State*, 660 So. 2d 637, 647-48 (Fla. 1995). All of these claims were properly denied by the trial court.

*Hannon*, 941 So. 2d at 1144.

Hannon has failed to establish any basis to excuse his procedural default. *See, e.g., Mills, supra*. Moreover, Hannon has not cited to any United States Supreme Court case with materially indistinguishable facts, and Hannon has failed to demonstrate that the Florida Supreme Court's

ruling was contrary to or an unreasonable application of any clearly established federal law. In fact, as noted in *Mills*, the Eleventh Circuit previously considered the "automatic aggravator" claim and found it to be meritless, and the United States Supreme Court has expressly rejected this claim. *See Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (fact that one aggravator duplicates an element of the crime does not make sentence constitutionally infirm as long as narrowing of eligible class is otherwise accomplished). Should this claim ever be decided otherwise, the change would amount to a new rule which could not be applied retroactively on habeas review under *Teague v. Lane*, 489 U.S. 288 (1989).

Finally, Hannon's two death sentences each rely on other additional aggravating factors, including Hannon's prior violent felony convictions, the "HAC" aggravator; and, as to victim Carter, the additional "avoid arrest" aggravator. The presence of these multiple and additional aggravators guided the jury's discretion and narrowed the eligibility for the death penalty as constitutionally required.  Inasmuch as no United States Supreme Court decision is violated on these facts, no habeas relief is warranted under the AEDPA.  Ground Nine is procedurally barred, and without merit.

Ground Nine does not warrant habeas corpus relief.

Ground Ten

**The application of the heinous, atrocious and cruel aggravating factor violated Mr. Hannon's Eighth and Fourteenth Amendment rights because it did not apply in Mr. Hannon's case and was unconstitutionally vague**

See Amended Petition at 18-19 (Doc. 13-2); Memo at 52 (Doc. 10). This claim is procedurally barred and without merit.  On direct appeal, *Hannon*, 638 So. 2d at 43, the Florida Supreme Court held that Hannon's unpreserved <u>vagueness</u> challenge to the HAC instruction

was procedurally barred.   The vagueness claim was barred because, at trial, defense counsel objected to the instruction's being given, on the facts of the case, but did not object to the wording of the instruction, or to any vagueness in the wording or terms. *Hannon*, 638 So. 2d at 43. *See Ponticelli v. State*, 941 So. 2d 1073 (Fla. 2006). Alternatively, the Court stated that failure to give an adequate instruction on the aggravating factor was harmless error. *Hannon*, 638 So. 2d at 43.

On direct appeal, the Florida Supreme Court pointed out that the facts of Hannon's case supported the "heinous, atrocious, or cruel" aggravating factor. The Court found that the heinous, atrocious or cruel aggravating factor applied to Snider's murder because Snider was brutally stabbed numerous times, and Hannon "slit Snider's throat." *Id.* The Florida Supreme Court also stated that it was appropriate to find Carter's murder to be heinous, atrocious, or cruel because he suffered great fear and terror prior to being murdered. *Id.* The Florida Supreme Court has consistently upheld findings of heinous, atrocious, or cruel under similar circumstances. *Trotter v. State*, 576 So. 2d 691, 694 (Fla. 1990); *Campbell v. State*, 571 so. 2d 415, 418 (Fla. 1990).

On his subsequent postconviction appeal, Hannon sought to resurrect his challenge to the application of the HAC aggravator, and the Florida Supreme Court again applied a procedural bar. The Florida Supreme Court held:

> Hannon asserts that the facts of the instant case do not support the finding of heinous, atrocious, or cruel. On direct appeal, this Court rejected this claim. *See Hannon*, 638 So. 2d at 43. Accordingly, we hold that this claim is procedurally barred because it was addressed and denied on direct appeal.

*Hannon*, 941 So. 2d at 1147.

The state court's findings, including that of harmless error, were not contrary to, or an

unreasonable application of, clearly established federal law. The Florida Supreme Court is the final arbiter of Florida law; federal courts must respect that law absent a constitutional violation. "Under 28 U.S.C. § 2241, a writ of habeas corpus disturbing a state-court judgment may issue only if it is found that a prisoner is in custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3)(1976)  A federal court may not issue the writ on the basis of a perceived error of state law. . .even if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment."  *Pulley v. Harris*, 465 U.S. 37, 41-42 (1984). No such circumstances have been demonstrated in this case.

No constitutional error has occurred in this case; however, any possible error would clearly be harmless based on the facts and the record.  The Florida Supreme Court has recognized that an inadequate jury instruction on the HAC aggravating factor does not affect the outcome of a case when the acts perpetrated by a defendant were heinous, atrocious or cruel under any definition. *See, State v. Stewart*, 636 So. 2d 16 (Fla. 1994). The Florida Supreme Court found that Hannon's murders fit within the constitutional definition of heinous, atrocious, or cruel.

Hannon has failed to demonstrate that the state court's rejection of this claim applied law contrary to established United States Supreme Court precedent or in a manner which was objectively unreasonable in light of such precedent.

Ground Ten does not warrant habeas corpus relief.

Ground Eleven

**Mr. Hannon's sentencing jury was misled by comments, questions, instructions that unconstitutionally and inaccurately diluted the jury's sense of responsibility towards sentencing in violation of the Eighth and**

**Fourteenth Amendments to the U.S. Constitution. Trial counsel failed to object to this constitutional error**

In his petition, Hannon asserts:

> Mr. Hannon's jury was repeatedly instructed by the court and prosecutor that its role was "advisory" and just a "recommendation." (R 1785-1789)  As a result, the jury's sense of responsibility was diminished in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  Counsel's failure to object without a tactic or strategy rendered Mr. Hannon's sentencing unreliable.

Amended Petition at 20-21 (Doc. 13-2); Memo at 52 (Doc. 10).  Although Hannon refers to "comments and questions,"  his reference is vague and the Court cannot determine the comments or questions he refers to except as they apply to the jury instruction.

Hannon's claim should have been raised at trial and on direct appeal.  Hannon admits that it was not. Amended Petition at 20 (Doc. 13- 2). Therefore, the claim is procedurally barred under state law. *See, Thompson v. State,* 759 So. 2d 650, 665, n.10 (Fla. 2000).  Hannon has not shown cause and prejudice to overcome the procedural default and has not shown that a fundamental miscarriage of justice will occur if this Court does not meet the merits of the claim.

Hannon belatedly raised this claim in his state postconviction motion. In summarily denying postconviction relief, the state trial court ruled that Hannon's jury instruction claim was procedurally barred and, additionally, without merit. (App D6/1151-1153).

On postconviction appeal, the Florida Supreme Court agreed that the trial court properly summarily denied Hannon's jury instruction claims, including his *Caldwell* claim, because all of the individual assertions were procedurally barred or without legal merit. *Hannon,* 941 So. 2d at 1144.

Even if Hannon's *Caldwell* claim, that comments and instructions to his jury unconstitutionally diminished its sense of responsibility, was not procedurally barred, see

70

*O'Sullivan*, 526 U.S. at 848, the claim provides no basis for federal habeas relief.  In order to establish constitutional error under *Caldwell,* a petitioner must show that the comments or instructions to the jury "improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). The Eleventh Circuit has long recognized that comments describing the jury's role in Florida as making an advisory recommendation and the judge as the final sentencing authority do not present *Caldwell* error. *Johnston v. Singletary*, 162 F.3d 630 (11th Cir. 1998), *cert. denied*, 528 U.S. 883 (1999); *Provenzano v. Singletary*, 148 F.3d 1327, 1334 (11th Cir. 1998).

The Florida Supreme Court has repeatedly affirmed that the standard jury instructions properly describe the jury's role in Florida. *Archer v. State*, 673 So. 2d 17, 21 (Fla.), *cert. denied*, 519 U.S. 876 (1996) (Florida standard jury instructions adequately describe role to jury); *Pope v. Wainwright*, 496 So. 2d 798, 805 (Fla. 1986), *cert. denied*, 480 U.S. 951 (1987). No federal cases were ignored or misapplied in the state courts' rejection of this issue as both procedurally barred and, alternatively, without legal merit.

Ground Eleven does not warrant habeas corpus relief.

Ground Twelve

**Mr. Hannon's death sentence violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution because the law shifted the burden to Mr. Hannon to prove that death was inappropriate. Trial counsel failed to object to this constitutional error**

Hannon alleges that the prosecutor and court's comments shifted to Hannon, "the burden of proving whether he should live or die." Amended Petition at 21-22 (Doc. 13-2); Memo at 52-53 (Doc. 10).

Hannon admits that he did not raise any "burden shifting" claim at trial and on direct

71

appeal. Amended Petition at 21. (Doc. 13-2). Accordingly, this claim is procedurally barred.

In his state postconviction motion, Hannon argued that his death sentences violated the Fifth, Sixth, Eighth and Fourteenth Amendments because the law shifted the burden of proof to Hannon to prove that death was inappropriate, and the trial judge used that presumption in rendering a sentence. *Hannon*, 941 So. 2d at 1118. Hannon also alleged that trial counsel was ineffective in failing to object and preserve any "burden shifting" claim for direct appeal.

In affirming the state trial court's summary denial of Hannon's postconviction claims, the Florida Supreme Court stated:

> The trial court summarily denied Hannon's claims that trial counsel was ineffective in failing to object to what he contends were constitutional errors. Hannon now asserts the following: (1) the burden of proof was improperly shifted to Hannon during the penalty phase; (2) Hannon's jury was repeatedly instructed by the court and the prosecutor that its role was advisory and simply a recommendation, diminishing the jury's sense of responsibility in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985); and (3) instructing the jury that they could find as an aggravating circumstance the fact that Hannon was engaged in the commission of the crime of burglary based upon the State's alternative theory of felony murder rendered him automatically eligible for the death penalty. The trial court properly denied this claim because all of the individual assertions fail because they are procedurally barred or without legal merit. *See Power v. State*, 886 So. 2d 952, 956 (Fla. 2004); *Freeman v. State*, 761 So. 2d 1055, 1067 (Fla. 2000); *Blanco v. State*, 706 So. 2d 7, 11 (Fla. 1997); *Johnson v. State*, 660 So. 2d 637, 647-48 (Fla. 1995). All of these claims were properly denied by the trial court.

*Hannon*, 941 So. 2d at 1144.

This claim provides no basis for habeas corpus relief. Hannon does not offer any reason that *this* Court should review an issue rejected on an independent state ground by the state trial court and thereafter affirmed on appeal. Hannon cannot demonstrate that the state court either acted contrary to, or unreasonably applied, any prevailing federal law. The facts, as alleged, do not suggest any inconsistency with *Mullaney v. Wilbur*, 421 U.S. 684 (1975), which is the only

United States Supreme Court decision cited by Hannon in his perfunctory one-paragraph argument on this point. See, Memo at 53 (Doc. 10).

The Eleventh Circuit has previously rejected Hannon's claim with regard to the "burden shifting" argument. *Henderson v. Dugger*, 925 F.2d 1309, 1317-18 (11th Cir. 1991), *cert. denied*, 506 U.S. 1007 (1992). Furthermore, any allegations of constitutional error with regard to any of the jury instructions would require the creation of a new procedural rule, which could not be applied retroactively to Hannon's case. *Lambrix v. Singletary*, 520 U.S. 518 (1997) (federal habeas challenge to jury instructions as unconstitutionally vague was barred by *Teague*).

Ground Twelve does not warrant habeas corpus relief.

Ground Thirteen

**Mr. Hannon is innocent of the death penalty**

Hannon asserts that he is "innocent of the death penalty" because the State "failed to establish any aggravating circumstance making him death eligible." Amended Petition at 22-24 (Doc. 13-2); Memo at 53 (Doc. 10).   In this case, the state trial court found the following aggravating circumstances with respect to both murders: (1) previous conviction of a violent felony (the contemporaneous killings); (2) the murders were committed during the commission of a burglary; and (3) the murders were heinous, atrocious, or cruel. § 921.141 (5)(a), (d), and (h), Fla. Stat. (1991). As to Carter's murder, the state trial court found the additional aggravating factor that the murder was committed to avoid or prevent a lawful arrest. § 921.141 (5)(e), Fla. Stat. (1991). *Hannon*, 638 So. 2d at 41.

In his state court postconviction motion, Hannon alleged that he was "innocent of the death penalty." *Hannon*, 941 So. 2d at 1118. The state trial court rejected Hannon's claim as procedurally barred. The state trial court also found that the claim had no merit. (App. D6/1159-

73

1160)

On postconviction appeal, the Florida Supreme Court affirmed the summary denial of this

claim. The Florida Supreme Court stated:

> To prevail on a claim of being innocent of, or ineligible for, the death sentence received, Hannon must demonstrate constitutional error invalidating all of the aggravating circumstances upon which the sentence was based. *See Vining v. State*, 827 So. 2d 201, 216 (Fla. 2002). Hannon has not made such a showing here. Hannon's contention regarding the sufficiency of aggravation was decided adversely to Hannon on direct appeal and is not cognizable de novo in this postconviction proceeding. Specifically, this Court on direct appeal concluded that the facts of Hannon's case supported the finding of HAC and the prior violent felony aggravator with regard to both victims, and that the murder of Carter was committed for the purpose of preventing lawful arrest. *See Hannon*, 638 So. 2d at 43-44. This Court determined that Hannon's two sentences of death were proportionate and affirmed the convictions and sentences. *See id.* at 44. Accordingly, Hannon's "innocent of the death penalty" claim has no merit. *See Sochor v. State*, 883 So. 2d 766, 788 (Fla. 2004) (rejecting the defendant's "innocent of the death penalty" claim because the Court determined on direct appeal that the evidence supported the existence of three aggravating circumstances).

*Hannon*, 941 So. 2d at 1147.

Hannon's claim that he is "innocent" of the death penalty fails because multiple valid

aggravating circumstances support both of Hannon's death sentences. Pursuant to *Sawyer v.

Whitley*, 505 U.S. 333, 348 (1992), Hannon cannot show that "no reasonable juror would have

found him eligible for the death penalty." *See also, In re Provenzano*, 215 F.3d 1233 (11th Cir.

2000); *Sibley v. Culliver*, 377 F.3d 1196, 1205-1206 (11th Cir. 2004).

The Florida Supreme Court rejected Hannon's claim that he was innocent of the death

penalty because Hannon had multiple valid aggravating factors, which were affirmed on direct

appeal and remain valid in postconviction proceedings. None of Hannon's aggravating factors

have been set aside. Furthermore, as the Florida Supreme Court noted, Hannon failed to show

that *all* the aggravating circumstances upon which the sentences were based were invalid.

74

Hannon cannot show that the state court's fact-specific decisions were either contrary to, or an unreasonable application of, federal law. *See Sawyer v. Whitley*, 505 U.S. 333 (1992).

Ground Thirteen does not warrant habeas corpus relief.

### Ground Fourteen

**Newly discovered evidence shows Mr. Hannon's capital conviction and sentence are constitutionally unreliable in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

Hannon argues that he is entitled to relief on the basis of "newly discovered" evidence, specifically (1) the testimony of Kelly Reynolds[12] at Jim Acker's post-conviction hearing, and (2) the OIG[13] report on the FBI lab. Amended Petition at 24-27 (Doc. 13-2); Memo at 53-55 (Doc. 10).

### Kelly Reynolds

The state trial court summarily denied Hannon's postconviction claim regarding Kelly Reynolds' statements,[14] finding that her "statements do not make any reference to Defendant or the testimony Mr. Richardson gave in Defendant's trial." Therefore, "the alleged statements do not meet the newly discovered evidence standard as they are not of such nature that they would probably produce an acquittal on retrial." (App. D6/1167-1168)

### Special FBI Agent Malone

---

[12] Kelly Reynolds is Ron Richardson's niece and she purportedly has a child who was fathered by Jim Acker.

[13] OIG is an acronym for Office of the Inspector General.

[14] Hannon claims that Kelly Reynolds testified on April 30, 1999, that in 1992 or early 1993, she heard Ronald Richardson say that Jim Acker was not present when the murders occurred, and that he [Richardson] told prosecutors what they wanted to hear because he wanted out of prison. In addition, Kelly Reynolds testified that she heard Ronald Richardson, on the phone, tell his brother Mike, to forget the money Mr. Ronald Richardson owed Mike because Mr. Ronald Richardson had saved Mike from going to prison for life. (App. D6/1167-1168).

After hearing testimony at the evidentiary hearing, the state trial court rejected Hannon's

postconviction claim based on the alleged "newly discovered" evidence concerning Special FBI

Agent Malone and the OIG report. The state trial court explained:

> Defendant claims newly discovered evidence proved Defendant's capital
> conviction and sentence are constitutionally unreliable. Specifically, Defendant
> claims that Special FBI Agent Michael Malone gave unreliable and false testimony
> during trial. However, a review of the February 18, 2002 evidentiary hearing
> transcript and the June 21, 2002 evidentiary hearing transcript, reflect that
> Defendant failed to present any testimony to support his claim that Special FBI
> Agent Michael Malone gave unreliable and false testimony at Defendant's trial.
> (See February 18, 2002 Transcript, Volumes I and II, June 21, 2002 Transcript,
> Volumes I and II, attached). As such, no relief is warranted upon  this portion of
> claim XIX.

> Defendant further claims that the F.B.I. Crime Laboratory investigation by
> the U.S. Department of Justice was withheld by the State. In *White v. State*, 644
> So. 2d 242, 244 (Fla. 1995), the Florida Supreme Court cited *Brady v. Maryland*,
> 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), where the United States
> Supreme Court held that "the suppression by the prosecution of evidence
> favorable to an accused upon request violated due process where the evidence
> is material either to guilt or punishment..." The United States Supreme Court later
> explained the meaning of "material" in *U.S. v. Bagley*, 473 U.S. 667, 105 S. Ct.
> 3375, 87 L.Ed.2d 481 (1985):

>> The evidence is material only if there is a reasonable probability
>> that, had the evidence been disclosed to the defense, the result of
>> the proceeding would have been different. A "reasonable probability"
>> is a probability sufficient to undermine confidence in the outcome.

> *Id.* at 682, 105 S. Ct. at 3383.

> At the February 18, 2002 evidentiary hearing, Mr. Episcopo testified that it
> was not until after Defendant's trial that he became aware of the Justice
> Department's investigation and report about the F.B.I. Crime Laboratory. (See
> February 18, 2002 Transcript, pages 50 - 53, attached). Mr. Episcopo recalled that
> Mr. Malone testified that there was no evidence linking Defendant to the crime,
> and felt that he was a defense witness, and the State called Mr. Malone for the
> defense. (See February 18, 2002 Transcript, pages 48 and 115, attached). He
> further testified that he liked Mr. Malone's testimony about his work on serial
> killers, thought Mr. Malone was a sharp FBI agent who had nothing on Defendant,
> thought the jury would be impressed with the fact that he had worked on lots of
> cases, and his testimony helped Defendant's alibi defense. (See February 18,

2002 Transcript, pages 49 - 50, attached).

Moreover, Mr. Episcopo testified that he did not want to impeach Mr. Malone as he was trying to bolster the alibi defense and use Mr. Malone's testimony to help that defense. (See February 18, 2002 Transcript, page 55, attached). Mr. Episcopo testified that he did not want to contest his alleged expertise on serial murder cases because he wanted to argue that in closing. (See February 18, 2002 Transcript, page 60, attached). Mr. Episcopo testified that he was sure that he had a copy of the evidence collection report from the F.B.I. dated July 3, 1991, which reflected that no hairs like that of the Defendant were found on the specimens, and the fabric impression on a specimen was dissimilar from the impression made by the fabric from the knee area, thereby resulting in a finding that the fabric impression on the specimen could not be associated with Defendant's pants. (See February 18, 2002 Transcript, pages 52 - 53, attached). Lastly, Mr. Episcopo testified that although he was not sure whether he received the bench notes of Mr. Malone prior to trial, it did not matter because it would not have changed the defense's strategy at trial as Mr. Malone's investigation results seemed to be consistent with Defendant's alibi defense. (See February 18, 2002 Transcript, pages 53 - 58, attached). Therefore, had the evidence been disclosed to the defense, the result of the proceeding would not have been different as Mr. Episcopo testified that he would not have changed his trial strategy of maintaining that Defendant was not at the crime scene and did not commit the murders. Consequently, Defendant has failed to prove that the F.B.I. Crime Laboratory investigation by the U.S. Department of Justice which was allegedly withheld by the State was a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). As such, no relief is warranted upon this portion of claim XIX.

(App. D11/2040-2042).

On postconviction appeal, Hannon's "newly discovered" evidence claims were predicated on Jim Acker's subsequent life sentences, Kelly Reynolds' testimony in Acker's postconviction evidentiary hearing, and the OIG report's criticism of Special Agent Malone. In affirming the denial of postconviction relief on Hannon's claims of "newly discovered" evidence, the Florida Supreme Court rejected each of Hannon's claims, finding that the evidence was "not of such a character that it would probably produce an acquittal on retrial." *Hannon,* 941 So. 2d at 1144-1146 (citing and quoting *Mills v. State*, 786 So. 2d 547, 549 (Fla. 2001)).

Hannon's "newly discovered" evidence claim fails to present any federal constitutional

issue. Aside from Hannon's perfunctory citation to *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923), at footnote 13 of his memo (to ostensibly support his claim that Malone's testimony allegedly "was objectionable on several grounds"), Hannon has failed to identify any United States Supreme Court precedent which is either contrary to, or was unreasonably applied by, the state courts. See Memo at 55-56 (Doc. 10).[15] This failure renders his claim legally insufficient. *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003).

Moreover, the Florida state court's ruling was clearly supported by fact-specific findings and application of Florida law to Hannon's "newly discovered" evidence claims. Hannon cannot show that the state court's fact-specific decisions were either contrary to, or an unreasonable application of, federal law.

Ground Fourteen does not warrant habeas corpus relief.

Ground Fifteen

**Florida's capital sentencing statute violates the Sixth and Fourteenth Amendments under *Apprendi v. New Jersey* and *Ring v. Arizona***

Hannon argues that Florida's death penalty sentencing scheme violates *Ring v. Arizona*, 536 U.S. 584 (2002). (Amended Petition, pp. 27-28 (Doc. 13-2); Memo at 56 (Doc. 10)). Hannon raised this claim in a petition for writ of habeas corpus in the Florida Supreme Court. The Florida Supreme Court denied the claim based on the fact that *Ring* is not retroactive. The Florida Supreme Court also rejected the claim on the merits. *Hannon*, 941 So. 2d at 1150.

In denying Hannon's *Ring* claim, the Florida Supreme Court stated:

In his petition for writ of habeas corpus, Hannon argues that under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), Florida's death penalty scheme is unconstitutional and that the *Ring* decision applies retroactively

_____

[15] Hannon did not address this ground in the reply to Respondent's response to the petition.

to him. We have previously rejected each of the claims Hannon presents in his habeas petition. *See Johnson v. State*, 904 So. 2d 400 (Fla. 2005) (holding that *Ring* does not apply retroactively); *Monlyn v. State*, 894 So. 2d 832, 839 (Fla. 2004) (concluding that the defendant lacked standing to assert any error with regard to lack of jury unanimity because the jury returned a unanimous recommendation of death); *Duest v. State*, 855 So. 2d 33, 48-49 (Fla. 2003) (rejecting a claim that the jury must unanimously specify each aggravator found), *cert. denied*, 541 U.S. 993, 124 S. Ct. 2023, 158 L. Ed. 2d 500 (2004); *Doorbal v. State*, 837 So. 2d 940, 963 (Fla.) (stating that the prior violent felony aggravator based on contemporaneous crimes charged by indictment and on which defendant was found guilty by unanimous jury "clearly satisfies the mandates of the United States and Florida Constitutions"), *cert. denied*, 539 U.S. 962, 123 S. Ct. 2647, 156 L. Ed. 2d 663 (2003). Finally, we deny Hannon's habeas claim that he is entitled to relief based on a hybrid claim under *Ring* and *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), as we did in *Robinson v. State*, 865 So. 2d 1259, 1266 (Fla. 2004). Accordingly, we deny habeas relief on this claim.

*Hannon*, 941 So. 2d at 1150.

*Ring* cannot provide a basis to invalidate Hannon's death sentences for a number of reasons. First, reliance on the *Ring* decision is barred by the nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). See *Schriro v. Summerlin*, 542 U.S. 348 (2004); *see also, Turner v. Crosby*, 339 F.3d 1247, 1280 (11th Cir. 2003) (finding *Ring* claim procedurally barred); *Zeigler v. Crosby,* 345 F.3d 1300, 1312, n12 (11th Cir. 2003) (noting that *Zeigler* also challenged the application of an aggravating circumstance under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and ruling that Zeigler's challenge failed because neither *Apprendi* nor *Ring* applies retroactively on collateral review to convictions that became final before the cases were decided). See *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001)(*Apprendi*); *Turner v. Crosby*, 339 F.3d 1247, 1283(11th Cir. 2003) (*Ring*); *Sibley v. Culliver*, 377 F.3d 1196, 1207-1208 (11th Cir. 2004) (rejecting habeas petitioner's *Ring* claim "out of hand" and reiterating that, under "*Turner and Summerlin*, a petitioner may not appeal a conviction or bring a habeas

attack based on *Ring* violations that occurred before *Ring* was handed down.").

In addition, Hannon cannot show that any *Ring* violation occurred. The Florida Supreme Court has expressly recognized that the maximum penalty for first degree murder under Florida's statutory scheme is death. *Mills v. Moore*, 786 So. 2d 532, 536-538 (Fla.), *cert. denied*, 532 U.S. 1015 (2001); *Porter v. Crosby*, 840 So. 2d 981, 986 (Fla. 2003); *Shere v. Moore*, 830 So. 2d 56, 61 (Fla. 2002) ("This Court has defined a capital felony to be one where the maximum possible punishment is death").

The Florida Supreme Court has rejected numerous *Ring* challenges, consistently finding that Florida's sentencing scheme comports with the Sixth Amendment. *See Bottoson v. Moore,* 833 So. 2d 693 (Fla.), *cert. denied*, 537 U.S. 1070 (2002); *King v. Moore*, 831 So. 2d 143 (Fla.), *cert. denied*, 537 U.S. 1067 (2002); *Kormondy v. State*, 845 So. 2d 41, 54 (Fla. 2003) (*Ring* does not encompass Florida procedures or require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury). Furthermore, in this case, the jury recommended the death penalty by a unanimous vote of 12-0. Therefore, Hannon lacked standing to assert any error with regard to lack of jury unanimity because the jury returned a unanimous recommendation of death. Additionally, Hannon was found guilty by a unanimous jury of the contemporaneous crimes that formed the basis of the "prior violent felony" aggravator. As the Florida Supreme Court noted, this circumstance "clearly satisfies the mandates of the United States and Florida Constitutions." Hannon has not alleged any federal constitutional error in Ground Fifteen and Ground Fifteen does not warrant habeas corpus relief.

Ground Sixteen

**Mr. Hannon did not receive a fair trial under the Sixth, Eighth, and**

**Fourteenth Amendments because of cumulative error**

Hannon summarily asserts that a combination of errors violated his right to a fair trial and sentencing. Amended Petition, pp. 28-29 (Doc. 13-2); Memo, 56-57 (Doc. 10). This claim does not present any federal constitutional issue. Hannon's "cumulative error" claim was raised in state postconviction. The state trial court denied the claim as meritless. The trial court stated: "[b]ased upon the Court's rulings on claims 1 through XX, no relief is warranted." (App. D10/2043). On appeal of the denial of the postconviction motion, the Florida Supreme Court affirmed the ruling of the state trial court stating:

> Hannon's claim of cumulative error is without merit. As all of Hannon's individual claims are either procedurally barred or without merit, his cumulative error claim must fail. *See Griffin v. State*, 866 So. 2d 1, 22 (Fla. 2003) ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."); *Vining v. State*, 827 So. 2d 201, 219 (Fla. 2002) ("Because the alleged individual errors are without merit, the contention of cumulative error is similarly without merit."); *see also Downs v. State*, 740 So. 2d 506, 509 n.5 (Fla. 1999). Therefore, this claim is also rejected.

*Hannon*, 941 So. 2d at 1148.

In his one-paragraph argument on this claim, Hannon failed to identify any United States Supreme Court precedent which is either contrary to, or was unreasonably applied by, the state court. See Memo at 56-57 (Doc. 10). This failure renders his claim legally insufficient. *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003).

Although Hannon does not identify any specific errors he believes must be considered in this claim, many of the issues he presents in his habeas petition are not properly before the Court, and therefore not subject to consideration in a cumulative error analysis. *Sims v. Singletary*, 155 F.3d 1297, 1314 (11th Cir. 1998) (reversing grant of habeas relief on sentencing due to cumulative guilt phase errors; noting claims barred procedurally or on non-retroactivity

grounds could not be considered in cumulative analysis), *cert. denied*, 527 U.S. 1025 (1999).

Hannon offers no specific complaint about the state court's resolution of this issue. The Florida

Supreme Court determined that no trial errors required cumulative consideration. Hannon has

not identified any such errors, or alleged that any United States Supreme Court decision was

ignored or misapplied by the Florida Supreme Court's ruling on this claim.

Ground Sixteen does not warrant habeas corpus relief.

Ground Seventeen

**Petitioner's Fifth, Sixth and Fourteenth Amendment rights were violated because he was convicted of a crime not charged in the indictment**

In his final claim, Hannon asserts that he was convicted of a crime not charged because

the State charged Hannon with premeditated murder and the trial court instructed the jury on

both premeditated murder and felony murder, with burglary as the underlying felony. Amended

Petition, pp. 29-30 (Doc. 13-2); Memo, 57-58 (Doc. 10).

Hannon admits that he did not raise his "conviction of a crime not charged in the

indictment" claim at trial and on direct appeal. Amended Petition at 30 (Doc. 13-2). Accordingly,

the claim is procedurally barred. *Coleman, supra*. However, Hannon argued this issue in his

state habeas petition as a subsidiary claim of ineffective assistance of appellate counsel and

also as alleged fundamental error. The Florida Supreme Court determined that Hannon's

underlying claim was both meritless and procedurally barred. Specifically, the Florida Supreme

Court stated:

> Hannon asserts that he is entitled to a new trial due to fundamental error because he was convicted of a crime not charged in the indictment. The grand jury indicted Hannon, charging him with two counts of murder from a premeditated design for the deaths of Brandon Snider and Robert Carter. The indictment did not charge Hannon with felony murder, burglary, or any other felony. The trial judge in the instant case instructed the jury on first-degree premeditated murder and

first-degree felony murder and defined the crime of burglary. The jury returned a general verdict finding Hannon guilty of first-degree murder. Hannon argues that reversal of his conviction is warranted because the jury just as likely found Hannon guilty of felony murder, which he was not charged with, as premeditated murder.

We have repeatedly held that there is no error in permitting the State to proceed on a theory of felony murder when the indictment charges the defendant with first-degree premeditated murder. *See Anderson v. State*, 841 So. 2d 390, 404 (Fla. 2003) (rejecting the defendant's argument that the trial court erred in permitting the State to proceed on the theory of felony murder when the indictment only charged first-degree murder); *Kearse v. State*, 662 So. 2d 677, 682 (Fla. 1995) ("The State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder."); *Knight v. State*, 338 So. 2d 201, 204 (Fla. 1976) ("We find appellant's allegation that the court erred in allowing the State to prosecute the charges [sic] under a theory of felony murder when the indictment charged premeditated murder to be absolutely contrary to established precedent."). Therefore, we conclude that appellate counsel was not ineffective for failing to present this meritless issue on appeal. *See Rutherford*, 774 So. 2d at 643.

Hannon further alleges that he is entitled to relief pursuant to this Court's decision in *Delgado v. State*, 776 So. 2d 233 (Fla. 2000), where this Court held that the phrase "remaining in," which is found in the burglary statute, was limited to situations where the "remaining in" was done surreptitiously. *See id.* at 240. However, the *Delgado* Court specifically stated that its "opinion will not, however, apply retroactively to convictions that have become final." *Id.* at 241. Hannon's convictions and sentences were affirmed on direct appeal on June 2, 1994, and therefore had become final prior to the release of *Delgado. See Jimenez v. State*, 810 So. 2d 511, 512 (Fla. 2001) (determining Delgado is not subject to retroactive application and that *Jimenez* was not entitled to relief pursuant to *Delgado* since Jimenez's convictions were final prior to the release of *Delgado*). Accordingly, Hannon is not entitled to relief pursuant to *Delgado*.

Hannon asserts that this Court recently confronted a similar question in *Fitzpatrick v. State*, 859 So. 2d 486 (Fla. 2003); however, Hannon's reliance on *Fitzpatrick* is misplaced. In *Fitzpatrick*, this Court invoked the principle that "a general verdict is invalid when it rests on multiple bases, one of which is legally inadequate," and reversed for a new trial because the jury had been given an erroneous burglary instruction. *Id.* at 490 (emphasis added) (citing *Yates v. United States*, 354 U.S. 298, 312-13, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957)). Since Fitzpatrick's conviction had not become final at the time *Delgado* was released, *Delgado* was applicable to Fitzpatrick, and thus the general verdict in his case was invalid because it rested on multiple bases, one of which at the time of Fitzpatrick's direct appeal was inadequate due to *Delgado*'s applicability. Hannon's claim is

different from Fitzpatrick because, as previously explained above, *Delgado* is not applicable to Hannon's case.

Finally, Hannon claims that his appellate counsel was ineffective for failing to present on direct appeal that Hannon was convicted of a crime for which he was not charged in the indictment. This Court rejected this claim in *Freeman v. State*, 761 So. 2d 1055, 1071 (Fla. 2000) (rejecting Freeman's claim that "appellate counsel was ineffective for failing to argue that the trial court erred in denying the pretrial motion to dismiss the indictment because it did not specifically charge felony murder"); *see also Gudinas v. State*, 693 So. 2d 953, 964 (Fla. 1997) ("We have repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory."). Thus, we conclude that appellate counsel was not ineffective for failing to present this meritless issue on appeal. *See Rutherford*, 774 So. 2d at 643.

*Hannon*, 941 So. 2d at 1148-1149.

The Eleventh Circuit has long recognized that, under Florida law, it is permissible for the prosecution to proceed on either a felony murder or premeditated murder theory when the indictment charges only the offense of first degree murder or premeditated murder. *See Knight v. Dugger*, 863 F.2d 705 (11th Cir. 1988). The *Knight* court stated:

at the time of Petitioner's trial, Florida law permitted (and still does) the state to prosecute under premeditated or felony murder theories when the indictment charged premeditated murder," and further explaining that the "State prosecuted primarily under a premeditated design theory even though evidence showing felony murder was introduced at trial. The trial court simply refused to limit the state to one theory of prosecution where state law permitted the prosecution to proceed under a dual theory. If there was error by the trial court, this Court is convinced that such error was not of a constitutional dimension. The benefit to the state from the error (if any was committed) did not contribute to Petitioner's conviction since there was ample evidence upon which to base a conviction under either theory.")

*Knight*, 863 F.2d at 725.

Hannon contends that he is entitled to federal habeas relief under *Yates v. United States*, 354 U.S. 298 (1957). (Memo at 58, Doc. 10). In *Yates*, the defendants were charged in a single count with conspiring to advocate the overthrow of the government (the "advocacy" charge) *and*

84

with conspiring to organize, as the Communist Party, a society that advocates the overthrow of the government (the "organizing" charge). The defendants were convicted, but the jury's general verdict did not indicate whether the jury found them guilty on the "advocacy" charge or the "organizing" charge. The Supreme Court concluded that the "organizing" charge was barred by the statute of limitations, and, citing *Stromberg v. California*, 283 U.S. 359 (1931), followed the rule "which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* at 312.

Hannon is not entitled to any relief on the basis of *Yates* and its progeny because it is legally permissible to proceed on a theory of felony murder even though the indictment charges premeditated murder. Hannon's case is distinguishable from *Yates* because Hannon's conviction was supportable on both felony murder and premeditated murder.   Hannon cannot show that the state court's fact-specific decision, and rejection of procedurally barred claims was either contrary to, or an unreasonable application of, federal law under AEDPA.

Ground Seventeen does not warrant habeas corpus relief.

**The Court has carefully considered each of Hannon's claims as required by *Clisby v. Jones*, 960 F. 2d 925 (11th Cir. 1992), *cert. denied, Clisby v. Alabama*, 513 U.S.1162 (1995). None of the claims warrant habeas corpus relief.**

**Accordingly, the Court orders:**

That Hannon's petition for writ of habeas corpus is denied.  The Clerk is directed to enter judgment against Hannon and to close this case.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that petitioner is not entitled to a certificate of appealability.

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue ⋯ only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further, ' " *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances.

Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

ORDERED at Tampa, Florida, on October 23, 2007.

SUSAN C. BUCKLEW
United States District Judge

Counsel of Record